## JAMES H. O'CONNELL *vs.* MARY CASEY.

Hampden.    September 27, 1910. — October 19, 1910.

Present: KNOWLTON, C. J., HAMMOND, LORING, BRALEY, & SHELDON, JJ.

*Agency,* Existence of relation, Ratification, Revocation, Agent's commission. *Husband and Wife. Damages,* In contract.

At the trial of an action by a real estate broker against a married woman for a commission for procuring a sale of real estate of the defendant, it appeared that the negotiations of the plaintiff were entirely with the defendant's husband, and the defendant contended that there was no evidence that her husband was authorized by her to act for her in the employment of the plaintiff. The husband testified that the land in question had been bought by him and the title taken in his wife's name, that he put up a building upon it, occupied it for his business and never paid any rent to his wife "or anything of that kind," that he paid taxes, water rates, expenses for repairs, painting, plumbing and insurance out of his own money, that he did not always consult his wife about such things although he did sometimes, that all negotiations for the sale of the premises were conducted by him and that the money received therefor went into his bank account; and there was evidence tending to show that, when the husband transmitted to the defendant an offer in writing for the property which the plaintiff had procured for her acceptance, she then being temporarily absent at a distance, the husband told her not to sign until her return, and that she did not do so, that upon the wife's return the husband stated to the plaintiff that his wife would not sign the deed, saying, "What can I do?" *Held,* that there was evidence which warranted a finding that, although the legal title of the land stood in the defendant's name, she left the entire management of it to her husband.

At the trial of an action by a real estate broker against a married woman for a commission for procuring a sale of real estate of the defendant, it appeared that the negotiations of the plaintiff were entirely with the defendant's husband, and there was evidence from which a jury would have been warranted in finding that the husband had caused the real estate in question, which he himself paid for, to be conveyed to the defendant as a gift to her. Evidence of the plaintiff tended to show that, the property having been called to the plaintiff's attention by the defendant's husband, the plaintiff on July 23 of a certain year procured an offer for it at a price which the husband had named, and gave to the husband a form of option made out for the defendant's signature; that, in response to a question by the husband at that time, the plaintiff stated that his commission would be two per cent, which the husband said would be satisfactory; that the defendant was absent at the time in a distant city and that the husband stated that he would send the option to her; that the wife did nothing until her return about two weeks later, and upon her return refused to sign the option, and that the husband then said to the plaintiff, "If my wife won't sign the deed, what can I do?" The husband testified in cross-examination that he had told his wife, when he sent the option to her by mail, not to sign it until she returned. The property was sold to the plaintiff's customer on August 29. There was no

evidence that the defendant notified the plaintiff that she repudiated the arrangement as to a commission made with her husband. The defendant and her husband testified that she was not told of the plaintiff's employment. *Held*, that the fact. of the existence of the relation of husband and wife between the defendant and him with whom the plaintiff dealt, in connection with the other facts in evidence, warranted a finding by the jury that the husband told the defendant of the arrangement made with the plaintiff as to commission, and that, therefore, since the defendant did not repudiate the arrangement, a finding was warranted that the defendant ratified it, the jury being at liberty to disbelieve the testimony to the effect that the defendant was not told of the plaintiff's employment by her husband.

At the trial of an action by a real estate broker against a married woman for a commission for procuring a sale of certain real estate, it appeared that negotiations as to the employment of a broker had been carried on between the broker and the husband of the defendant, that the broker procured a customer who was willing to pay $15,000, the price set by the husband, that, the purchaser preferring that his name should not be known in the transaction, the plaintiff, without disclosing the name of the customer, proposed that the defendant should sign an option to sell the property to the plaintiff, and that the defendant refused to sign an option for a sale at the price mentioned. The plaintiff testified that the defendant's husband said to him that the defendant had been looking over his books which showed the business which he had been doing as a blacksmith on the real estate in question and was of the opinion that, if he moved to a location which he proposed to move to, he would lose money, and that the husband said to the plaintiff, "She says that she won't do any business at present," that the plaintiff then disclosed to the husband the name of his customer, and that the husband said, "I admit the price is good and everything is satisfactory as far as you and I are concerned, but if my wife won't sign the deed, what can I do?" There was evidence that afterwards the plaintiff was told to do nothing further about procuring a customer, and that in about a month the defendant sold the property to the same customer for $18,000. *Held*, that the jury might have found that the defendant did not revoke the plaintiff's authority to sell before the plaintiff disclosed the name of the customer, but that the conversation of the husband with the plaintiff amounted only to a refusal to sell for $15,000; and that a finding, that the revocation afterwards made was a revocation in bad faith, was warranted.

If the owner of real estate employs a broker to sell it for him for $15,000 and agrees to pay him "the usual two per cent commission," and the broker procures a purchaser at the price named and then the owner in bad faith revokes the broker's authority and himself sells the real estate to the customer whom the broker had procured for $18,000, what was done after such revocation is in legal contemplation done while the broker's authority remains unrevoked, and the broker is entitled to a commission of two per cent of $18,000, not of $15,000 only.

If, through the efforts of a broker employed by the owner to sell real estate, negotiations between the owner and a customer reached a point where, except for a revocation of the broker's authority by the owner, a sale would have been consummated, and if subsequently the owner sells the property to the same customer at a higher price under circumstances which would warrant a finding that the previous revocation of the broker's authority was made in bad faith, in an action by the broker against the owner for his commission, the question of whether the broker was the efficient cause of the trade finally made does not arise, because it does not affect the broker's right to his commission.

CONTRACT for a commission as a broker for procuring a sale of real estate for the defendant. Writ in the Police Court of Holyoke dated September 4, 1909.

On appeal to the Superior Court, the case was tried before *Schofield*, J. The important facts are stated in the opinion.

At the close of the evidence, the defendant asked for the following rulings among others:

" 1. Upon all the evidence the plaintiff cannot recover.

" 2. There is no evidence that James J. Casey [the defendant's husband] was authorized by Mary Casey [the defendant] to act as her agent in the employment of plaintiff.

" 3. As a matter of law the plaintiff's authority was revoked, if he ever had any, some time before the sale as finally made was completed."

" 5. In order to recover the plaintiff must show that he was the efficient and predominating cause of the trade actually made.

" 6. There is no evidence that the defendant subsequently ratified the employment of the plaintiff by her husband, James J. Casey, if such employment was made.

" 7. There is no evidence that the plaintiff was the efficient and predominating cause of the sale actually made."

" 10. If the defendant was induced to sell the property by reason solely of the higher price and the old building material, then the plaintiff must show that his efforts were the efficient and predominating cause for that higher price and old building material being given by the purchaser.

" 11. The plaintiff by disclosing to Mr. Casey at the time of the termination of Mr. O'Connell's employment the name of Mr. O'Connell's proposed customer did not and could not preclude Mrs. Casey from afterwards, acting in good faith and not in fraud of the plaintiff, making a trade with the same purchaser on terms more advantageous to herself without becoming liable to him for a commission."

The presiding judge refused to give these rulings.

That portion of the charge of the presiding judge to the jury, which related to a revocation of the plaintiff's authority in bad faith was, in substance, as follows:

" If the owner terminated the contract [with the plaintiff]

. . . but terminated it in bad faith, that is to say, with a fraudulent design — in the condition in which negotiations then were between Mr. O'Connell and his customer, the Farr Alpaca Company, — to obtain the benefit of Mr. O'Connell's efforts and effect a sale of the property without paying him his commission, then in that case the revocation would not have the effect to deprive Mr. O'Connell of his right to his commission. If there was a revocation . . . in bad faith by the owner . . . then Mr. O'Connell would have the right left to compensation. . . .

" Such an act on the part of the owner is, for the purposes of the law, taken to be a prevention by the owner of performance of the contract by the broker. If one man makes a contract with another, and the second person prevents the man from performing the contract, that man has a right to say, 'I have performed so far as I could; you prevented me from going any further, and as matter of justice and right I am entitled to stand just the same as if I performed my engagement in full, because you have prevented it.' . . .

" If you find the facts to be, . . . in regard to the revocation of the authority, that it was fraudulent, not in good faith, then Mr. O'Connell is entitled to stand, in spite of the option, just the same as he would have stood if he had performed his agency in full and procured a customer . . . would be entitled to recover a commission as if he had procured a customer for the price which he testifies was the price fixed, of $15,000. There is testimony that the usual commission and the commission agreed upon in this case was two per cent upon the price, as I remember the evidence."

The presiding judge further instructed the jury in substance that, if they were of the opinion that there had been no revocation of the plaintiff's authority, but that, although the offer of $15,000 was rejected, the property was left on the broker's hands for sale, then, " if the owner chose to make use of the agency of the broker, properly and fairly employed, and to arrange the terms of the contract with the broker's customer, and the jury are satisfied upon all the evidence that the customer was procured by the broker, and that the negotiations, when they were renewed after the offer of $15,000 had been rejected, were renewed by reason of the work of the broker previously done, and

then if, in that state of facts, the owner chose to deal with the customer, fix the terms of sale, without consulting the broker or using his services any further, the broker, upon that state of facts, is entitled to a commission upon the sale actually made by the owner."

The jury found for the plaintiff in the sum of $300, which, in response to a question by the presiding judge, they stated was computed upon the sum of $15,000. The defendant alleged exceptions.

*R. P. Stapleton,* for the defendant.

*J. B. Carroll,* for the plaintiff, was not called upon.

LORING, J. The main facts in this case are as follows:

In 1907 the plaintiff and the defendant's husband had a conversation about the sale of the defendant's land and buildings where the husband carried on his business as a blacksmith. The plaintiff testified that the husband then employed him as a broker to get a customer for them at the price of $15,000. The husband testified that the plaintiff wanted him to put a price on them at that time; that he refused to do so, but said, "If any one gave me an offer of $15,000 I would consider it with my wife." In March, 1909, one Metcalf, an officer of the Farr Alpaca Company, "came to" the plaintiff to see if he had any land for sale fit for a manufacturing site for the Barlow Manufacturing Company. The Barlow Company was then occupying as tenant some land of the Alpaca Company, on which the Alpaca Company wished to construct a building for its own use, and the Alpaca Company wanted a lot for the Barlow Company to induce the Barlow Company to surrender the lease and move away. The plaintiff showed him the defendant's lot and then called upon the defendant's husband to see if the price remained unchanged. He was told by the husband that the price was unchanged. Thereupon he gave Mr. Metcalf $15,000 as the price. In July Metcalf told him that his company would like an option on the land at that price, but that he did not want the Alpaca Company to be known in the matter, as it would bring all the real estate brokers down on them. Whereupon the plaintiff prepared an option running to himself for $15,000 and took it to the husband, explaining to him (the husband) that the option ran to him (the plaintiff) because his customer did not want to

be known in the matter. At that time the husband asked what the plaintiff's charge would be in case the deal went through, and the plaintiff told him the usual two per cent commission. To this the husband said that that would be satisfactory. As to this conversation there was no real dispute. The husband testified to it in substance. The husband then said in substance, " This property is my wife's; she is in the West; I will send the option to her." The option was dated July 23, the day of this conversation. In this conversation the husband said that he made it a condition of the sale that the plaintiff should procure for his business of a blacksmith a property known as the Barlow lot. This Barlow lot had nothing to do with the Barlow Manufacturing Company. The plaintiff accordingly procured an option on this Barlow lot. Before that option had run out the defendant returned to Holyoke and refused to sign the option. The plaintiff testified that the husband told him that the reason why the defendant refused to sign the option was because she had been looking over his books and thought that if he moved his blacksmith business up to the Barlow lot he would lose local business which he then had to the amount of $800 to $1,000 a year. The plaintiff then said that his customer was the Alpaca Company, who wanted the defendant's land for the Barlow Company, who were tenants of land belonging to the Alpaca Company which the Alpaca Company wished to occupy themselves, and that no one else would pay as much. To which the husband answered: " If my wife won't sign the deed, what can I do? " This was about the middle of August. On August 29 the husband and Metcalf agreed (subject to ratification by the defendant and the directors of the Alpaca Company) to a sale to that company for $18,000 and as much of the material of the building then occupied by the Barlow Company, which was to be torn down, as the husband should select for a new blacksmith shop. This was carried through on September 3.

1. The second ruling asked for was rightly refused.

The defendant's husband testified that he bought the land here in question " and put it in my wife's name "; that he put up the building which stood on it, occupied it for his business, and " never paid any rent for the property to my wife or anything of that kind." That he paid taxes, water rates, expenses

for repairs, painting, plumbing and insurance, out of his own money; "I did not always consult my wife about these things, sometimes I did"; that all the negotiations for the sale to the Alpaca Company were conducted by him, and the $18,000 received from it went into his bank account. There was no evidence that the defendant ever did anything about the premises beyond her testimony and that of her husband that she refused to sign the $15,000 option and after some time finally consented to sell for $18,000 and the old building material. It is significant in this connection that while the husband told the plaintiff that it was for his wife to decide upon the acceptance of the $15,000 option and finally disposed of that offer by the remark "If my wife won't sign the deed, what can I do," he testified on the stand that when he sent the $15,000 option to her in the west he told her not to sign it until she came home. This warranted a finding that although the legal title stood in her name she left the whole management of this land and building to her husband.

2. The sixth ruling asked for was rightly refused. We are of opinion that although the jury could take the view just stated (that the defendant was the holder of the legal title only and left the whole management of the land and building to her husband) they could take the view that it was really a gift to the wife (see for example *Cooley* v. *Cooley*, 172 Mass. 476, 477; *Lufkin* v. *Jakeman*, 188 Mass. 528, 530). If they did take that view, the fact that they were husband and wife warranted a finding that the husband told his wife of the arrangement which he testified that he made in her behalf on July 23, 1909, with the plaintiff, for the usual commission of two per cent if the deal went through. If he did, there was evidence of a ratification. The defendant did not notify the plaintiff that she repudiated it. See in this connection *Reid* v. *Miller*, 205 Mass. 80. The jury were at liberty to refuse to credit the testimony of the defendant and her husband that she was not told of the plaintiff's employment. *Lindenbaum* v. *New York, New Haven, & Hartford Railroad*, 197 Mass. 314.

3. The defendant has contended that there was no evidence of bad faith within the rule laid down in *Cadigan* v. *Crabtree*, 186 Mass. 7.

There might be a question as to this point being open to the defendant under the exceptions taken at the trial. But it is apparent from the answer made by the jury to the question put to them by the presiding justice and from the amount of the verdict, when taken in connection with the instructions given by the judge, that the jury found that the defendant revoked the plaintiff's authority in bad faith. Under these circumstances it is more satisfactory to consider the point than to go into the niceties of the question whether it is or is not open to the defendant.

The defendant's contention is that there could be no bad faith because the plaintiff did not disclose the name of his customer until after the defendant had revoked his authority. And she relies in this connection on *Smith* v. *Kimball*, 193 Mass. 582, where the broker did not at any time disclose his customer's name.

But that contention is not well founded. The plaintiff's testimony was: That about a week after the date of the option the defendant's husband telephoned him that his wife "didn't care about selling, and he said, 'I am afraid we won't be able to go along with it by the way she feels at present.'" That he went to the husband's office the next day and the defendant then told him that his wife had been looking over his books, that she found that if he moved to the Barlow lot he would lose $800 to $1,000 of business (as stated in the beginning of this opinion), and ended with these words: "She says she won't do any business at present." That he, the plaintiff, then said he was sorry because his customer was the Alpaca Company, and that they wanted it for the Barlow Company, "who occupy a property that they wish to occupy, a property they wish to occupy themselves"; and that he (the plaintiff) then added, "I don't know any similar concern that would be willing to pay you $15,000 for the property," and the defendant ended the conversation with the remark, "I admit the price is good, and everything is satisfactory as far as you and I are concerned, but if my wife won't sign the deed, what can I do?"

This was not (or at any rate could be found not to be) a revocation of the plaintiff's authority to sell, but a refusal to sell for the price of $15,000, which up to that time had been the defendant's price.

It was the defendant's husband who testified that the plaintiff's authority was revoked. The husband testified that at this interview " he [the plaintiff] said, ' Since my efforts have been unsuccessful, I don't mind telling you who this property was for. It was for the Farr Alpaca people.' I said, ' Don't do anything more about it.' I told him several times to do. no more about it." Even on the husband's testimony the plaintiff's authority was not revoked (or it could be found that it was not revoked) until after the plaintiff disclosed the name of his customer. And even if this were not so the jury were at liberty to give credit to the plaintiff's story that the defendant's husband had gone no farther than to withdraw the price of $15,000 before he told him the name of his customer ; and to find that after this disclosure had been made he was told to do no more about it.

There was abundant evidence of a revocation in bad faith, and the eleventh request for a ruling was rightly refused, since it assumed as a fact that the disclosure of the customer was made after the revocation of the plaintiff's authority.

4. The defendant took an exception " to that part of the charge which was to the effect that if the authority of the plaintiff was revoked not in good faith, it was a prevention and the plaintiff might recover just as if he had found a purchaser who offered $15,000."

We are of opinion that this part of the charge was too favorable to the defendant. Where the principal revokes the broker's authority in bad faith in order to secure to himself the fruits of the broker's work without paying him for it, the revocation, being in fraud of the broker's rights, is of no effect so far as those rights and the trade subsequently made are concerned. In such a case what is subsequently done is in legal contemplation done while the broker's authority remains unrevoked. If the plaintiff's authority in the case at bar was revoked in bad faith, the plaintiff was entitled to two per cent on the price paid ($18,000 and the old building material) not two per cent " as if he had found a purchaser who offered $15,000." Where a defendant prevents performance by the plaintiff, the plaintiff can sue, but if he sues, the amount which he is entitled to recover is not the same as if he had performed. See for example *Barrie* v. *Quinby*, 206 Mass. 259, 267, 268.

The part of the charge excepted to was too favorable to the defendant, and this exception must be overruled.

5. Where the evidence warrants the jury in finding that the negotiations had progressed to such a point that a revocation of the broker's authority (if his authority is revoked) is made in bad faith, the question of the plaintiff's being the efficient cause of the trade subsequently made does not arise. The fact that through the broker's efforts the negotiations have reached the point where it can be found that his authority, if revoked, has been revoked in bad faith, is of itself a finding that he found the customer for his principal if his principal finally agrees on a price with the customer found by the broker. It is no part of the broker's duty to see to the making of the contract between his principal and the customer found by him. *Fitzpatrick* v. *Gilson*, 176 Mass. 477, 479.

The exception to the refusal to give the fifth ruling asked for must be overruled.

6. The judge told the jury that the only purpose for which they could consider (1) the evidence that the husband told the plaintiff that there was no question but that the wife would sign the option because she generally did what he asked her, and (2) the evidence that the husband told the plaintiff that his wife had been looking over his books and had found out that he would lose $800 to $1,000 by moving his business to the Barlow lot, as he then proposed to do, was " for the purpose of contradicting Mr. Casey's testimony and affecting his credibility." We are of opinion that these matters were material and therefore that the contradictory statements were competent on the witness's credibility.

*Exceptions overruled.*