ALBA M. LATTUCA *vs.* FREDERICK L. CUSOLITO & others.

Middlesex.    December 5, 1961. — March 12, 1962.

Present: WILKINS, C.J., SPALDING, WILLIAMS, WHITTEMORE,
& SPIEGEL, JJ.

*Broker,* Commission. *Contract,* With broker, Implied contract, Perform-
ance and breach. *Damages,* For breach of contract. *Equity Pleading
and Practice,* Rehearing.

Under a sealed, bilateral agreement whereby an owner of property em-
ployed a broker as exclusive agent to sell the property at a stated com-
mission for a specified time and the broker was to "furnish her profes-
sional services," the agency was not revocable by the owner during such
time.    [751]
A unilateral promise by an owner of property to employ a broker as ex-
clusive agent to sell the property at a stated commission for a certain
time, unsupported by consideration other than performance by the
broker, would be revocable by the owner prior to such performance.
[751–752]
A broker employed to sell property under a contract providing for a
specific commission upon its sale and for "no further compensation
other than" the commission would not be entitled to recover from the
owner the fair value of services rendered.    [752]
Upon appeals from an interlocutory decree confirming a master's report
and a final decree in a suit in equity, both decrees were reversed and the
suit was remanded to the trial court for further hearing by a master or
by the court where the confirmed report did not contain sufficient find-
ings to enable this court to determine the substantial issues involved.
[752–753]

BILL IN EQUITY, filed in the Superior Court on September
20, 1960.

Interlocutory decrees denying a motion by the defendants
to recommit to a master and confirming the master's report
were entered by *O'Connell,* J.   A final decree was entered
by *Rose,* J.

*Richard S. McCabe,* for the defendants.

*Jerome D. Goodman,* for the plaintiff.

SPIEGEL, J.   This is a bill in equity for a declaratory de-
cree under G. L. c. 231A by which the plaintiff seeks a deter-

mination of "the rights, duties, status and legal relations of the parties" under an "Agreement for Exclusive Real Estate Brokerage" entered into by them and of any amounts of money as may be due her. The case was referred to a master. The defendants filed objections to the master's report (which under Rule 90 of the Superior Court [1954] are treated as exceptions) and moved to have the report recommitted. The motion was denied and an interlocutory decree was entered overruling the defendants' exceptions and confirming the master's report. A final decree was entered adjudging that the defendants were indebted to the plaintiff in the amount of $38,641.48. The defendants appeal from the interlocutory and final decrees.

The following is a summary of facts as found by the master. The defendants Quirk and Cusolito, in March, 1959, sought the services of the plaintiff, Lattuca, a licensed real estate broker, regarding the acquisition of a parcel of land located in Maynard, Massachusetts, herein called Pine Knoll Acres.

On June 17, 1959, Lattuca had under contract the purchase of a parcel of land in Acton, Massachusetts. She agreed to sell this parcel (except for one lot which she was retaining for "her own") to Quirk and Cusolito for $5,800 and in addition Lattuca was to be employed as exclusive broker for all buildings to be erected by Quirk and Cusolito on the land.

On June 20, 1959, a contract for the sale of Pine Knoll Acres was executed by the owners thereof and Quirk and Cusolito.

On September 10, 1959, Lattuca entered into a written "amendment to agreement" with Quirk and Cusolito, by the terms of which Quirk withdrew from participation in the agreement of June 17, 1959; Lattuca waived the right to retain a portion of the Acton parcel; and the purchase price of the Acton parcel was reduced to $4,500.

On that same day (September 10, 1959) and "as a part of the same transaction" Quirk and Cusolito, by an instrument dated August 28, 1959, entered into a written "Agree-

ment for Exclusive Real Estate Brokerage'' with Lattuca for the sale of the Pine Knoll Acres property.[1]

Title to the Pine Knoll Acres property passed to Cusolito by deed dated January 22, 1960, and delivered on January 27, 1960. The defendants agreed that ''[f]or the purposes of this case'' Quirk and Cusolito ''stand on equal footing [as] co-owners.''

Quirk and Cusolito caused the incorporation of the defendant Pine Knoll Acres, Inc. Cusolito, his wife, and Quirk's wife were made officers of the corporation. The Pine Knoll Acres property was conveyed to the corporation by deed acknowledged on February 16, 1960, and recorded on May 19, 1960.

On May 24, 1960, the ''Plot Plan'' of Pine Knoll Acres showing the subdivision of the tract into thirty-eight building lots was approved by the Maynard planning board. Thereafter, ''the plaintiff began active efforts to develop plans for the sale of lots and houses to be erected thereon by the defendants.''

In May or early June, 1960, Quirk and Cusolito told Lattuca that they owned another tract located near by called Summer Hill which was ''plotted'' into thirteen lots. Two houses had been completed at Summer Hill which they were unable to sell and they asked Lattuca ''to incorporate this tract and these houses into the Pine Knoll Acres Project, promotion and advertising, and to try to sell these on the same exclusive brokerage arrangement. To this the plaintiff agreed.''

By July 9, 1960, ''the defendants had completed and

---

[1] The master in his report summarized the agreement as follows: ''the defendants Quirk and Cusolito . . . employed the plaintiff broker as exclusive agent for the sale of all houses to be erected on the Aho property . . . [Pine Knoll Acres] by them and on all lots at a commission of 4% on the sales of buildings, and 10% on sales of unimproved land; . . . plaintiff's exclusive agency should continue for two (2) months next following completion of a home ready for sale and following the expiration of that two months, continue for two more months at one-half of the commission earned by any other broker, and . . . thereafter plaintiff shall continue as broker without exclusive right or co-brokerage; . . . 'plaintiff shall furnish her professional services and expense of advertising and showing the property with no further compensation other than the aforesaid commissions.' ''

made ready for sale three houses in Pine Knoll Acres'' in addition to the two houses already constructed at Summer Hill.

''Between July 10, 1960, and August 2, 1960, the two houses in Summer Hill and eighteen houses in Pine Knoll Acres were sold; the two at Sixteen Thousand Nine Hundred Dollars ($16,900) and the eighteen in Pine Knoll Acres at Eighteen Thousand Nine Hundred Dollars ($18,900).''

Quirk maintained an office in one of the ''Model Houses'' which had been built on Pine Knoll Acres. Lattuca would deliver ''binders'' to this office ''signed by . . . [her] customers, or take such customers to discuss desired modifications of house plans, and close the sale.''

''The defendant Pine Knoll Acres, Inc., upon its acquisition of the title of defendant Cusolito, and the interest of the defendant Quirk, adopted the arrangements of those individual defendants with the plaintiff; thereafter received the benefits of the plaintiff's efforts and expenditures, and received the deposits made by the several purchasers and the payments of the purchase prices.''

The defendant Quirk, by July 24, 1960, ''had made up his mind to get rid of the plaintiff and divert from her her commissions; seized upon the pretext of his being bothered by having to answer telephone calls to the plaintiff relating to business of hers other than Pine Knoll Acres; chided her for opening mail addressed to his wife at that office; reminded her that she was 'still the agent of Pine Knoll and would do things according to our rules'; sent the defendants' attorneys to the plaintiff at her office in Pine Knoll Acres to attempt negotiations regarding terms for plaintiff's giving up that office, giving up her brokerage rights, and removing herself from connection with Pine Knoll . . . .''

Lattuca continued her sales efforts until August 2, 1960, when she received a letter from attorneys of the defendant Cusolito informing her that she had ''no authority to act as agent or broker for Mr. Cusolito in the sale of any of said premises.''

The master drew the following alternative conclusions: "If, upon the foregoing facts, the plaintiff is entitled to recover on the 'Agreement for Exclusive Real Estate Brokerage' . . ., I find the defendants corporate and individual, are indebted to her" in the amount of $14,960 made up of the commissions from the sales of the two houses in Summer Hill and the eighteen houses in Pine Knoll Acres. "If, by reason of the defendants' breach of that contract, preventing the plaintiff's further performance, the plaintiff is entitled to recover upon a quantum meruit, I find the fair value of her services to be" $20,000. "If, by reason of the defendants' breach of that contract, preventing the plaintiff's further performance, the plaintiff is entitled to recover as damages what she actually would have received if the contract had been fully performed by her, I find the amount of plaintiff's damages to be" $37,516 which is 4% commission on the sales of the thirteen houses in Summer Hill and of the thirty-eight houses in Pine Knoll Acres.

The judge entered a final decree in accordance with the third alternative.

From the facts found by the master it could be determined, with regard to the Pine Knoll Acres property, that the defendants Quirk and Cusolito promised to give Lattuca an exclusive agency for the first two months after completion of each house, and "cobrokerage" for the next two months, thereafter Lattuca to continue as broker without exclusive right or cobrokerage. It could also be determined that this promise was supported by consideration and that the agreement was embodied in a sealed instrument. G. L. (Ter. Ed.) c. 4, § 9A. The agreement was bilateral in nature and irrevocable during the period while the agency continued. *Coan* v. *Holbrook,* 327 Mass. 221, 223. *John T. Burns & Sons, Inc.* v. *Brasco,* 327 Mass. 261, 263.

With regard to the Summer Hill property, however, the master found merely that the plaintiff agreed to "try to sell . . . [that property] on the same exclusive brokerage arrangement." We are unable to determine from the mas-

ter's report whether this agreement was supported by any consideration. Without consideration it would be a unilateral promise to pay Lattuca a commission if the properties were sold within the time specified. Under such circumstances the exclusive brokerage agreement could be revoked at any time prior to the sale of the property. See *Des Rivieres* v. *Sullivan,* 247 Mass. 443, 446; *Bartlett* v. *Keith,* 325 Mass. 265, 267.

On the basis of the present record it could be found that the acts of the defendants which prevented further sales efforts by Lattuca constituted a breach of the contract relating to Pine Knoll Acres and a revocation of the agency arrangement relating to Summer Hill. Lattuca would, therefore, be entitled to commissions from sales of Summer Hill properties which occurred prior to the revocation and within the time limits specified in the agreement. She would be entitled to commissions from sales of Pine Knoll Acres property which took place prior to the breach and within the time limits of the contract. She may also recover in this suit damages resulting from breach of the contract if a sufficient basis for estimation of damages is provided. See *Levine* v. *Lawrence & Co. Inc.* 305 Mass. 210, 212; *Buckley & Scott Util. Inc.* v. *Petroleum Heat & Power Co.* 313 Mass. 498, 506; Restatement: Contracts, § 331.

If it should be found that the arrangement on the Summer Hill property was a bilateral agreement, the rule of damages herein stated applicable to the Pine Knoll Acres property would also apply to the Summer Hill property.

Whether the agreement is bilateral or unilateral, Lattuca is not entitled to recover for the fair value of her services. The agreement expressly provides that her only compensation is to be by way of commissions on sales. See *John T. Burns & Sons, Inc.* v. *Brasco, supra,* 263.

The master has failed to find sufficient subsidiary facts from which to determine the amount of commissions due Lattuca. He found that by July 9, 1960, five houses were "completed and made ready for sale," and on July 10, 1960,

seven "properties" were "purchased." He also found that between July 10, 1960, and August 2, 1960, twenty houses were "sold." There are no findings which describe the transactions entered into between the brokers or the owners and the prospective purchasers which might support the conclusion that seven properties were purchased or twenty houses were sold. His reference to the "binders" sheds little light on this question. The master made no finding as to the exact date of the Summer Hill agreement which would mark the beginning of the exclusive agency period for the two completed houses in that project.

Such findings are crucial to a determination of the amount of commissions, if any, earned by Lattuca prior to the defendants' breach or revocation as the case may be. They are also essential in order to provide a basis for forecasting the amount of commissions which she might have earned on sales had she not been prevented from fully performing the contract.

It has been held that, when a master has failed to make sufficient subsidiary findings on vital issues, recommittal of the report is required. We are of opinion that this is such a case. *Turgeon* v. *Turgeon,* 326 Mass. 384, 386. *American Employers' Ins. Co.* v. *Cohen,* 334 Mass. 417, 421. *Lenari* v. *Kingston,* 342 Mass. 705, 710. Whether the rehearing should be before the court or before a master is for the Superior Court to decide. In the event the latter course is pursued the judge is to determine to what extent, consistent with this opinion, the report of the master is to be set aside.

The entry is to be: Final decree reversed; interlocutory decree confirming report of master reversed; the suit to stand for further proceedings in the Superior Court.

*So ordered.*