ORVILLE E. FORTUNE vs. THE NATIONAL CASH
REGISTER COMPANY.

Norfolk.    January 16, 1976. — June 23, 1976.

Present: HALE, C.J., GOODMAN, GRANT, & ARMSTRONG, JJ.

*Contract,* Performance and breach, Contract of employment.

A salesman employed under a written contract terminable at will which
   provided for payment of certain bonus credits for any sales within
   his territory if the territory was assigned to him at the date of the
   order and additional bonuses if the territory was assigned to him at
   the date of delivery, was not entitled to recover the additional bo-
   nuses for orders delivered after his employment had been terminated
   even if the employer terminated the contract in bad faith to avoid
   paying the bonuses. [387-394] GOODMAN, J., dissenting.

CONTRACT. Writ in the Superior Court dated June 15,
1971.

The action was heard by *Brogna,* J.

*Andrew F. Lane* for the defendant.

*David H. Locke* (*A. Arnold Lundwall* with him) for the
plaintiff.

ARMSTRONG, J.    By the first two counts of the plain-
tiff's amended declaration, he seeks recovery of certain
bonuses claimed to be due him under a written contract
with the defendant, his former employer. By count three
he seeks recovery in the same amount on a quantum me-
ruit for the fair value of services which allegedly gave rise
to the bonuses. The defendant appeals from a judgment
for the plaintiff in the amount of $45,649.62.

The only question we find it necessary to reach is
whether the defendant's motion for a directed verdict was
properly denied.[1] We summarize the evidence most favor-

---

[1] While the defendant's motion for a directed verdict was defective
in that it failed to "state the specific grounds therefor" (Mass.R.Civ.P.

able to the plaintiff. *H. P. Hood & Sons, Inc.* v. *Ford Motor Co.* 370 Mass. 69, 71 (1976), and cases cited.

The plaintiff was employed by the defendant as a salesman under a written contract terminable at will, without cause, by either party. The contract, apparently used generally by the defendant, assigned to a salesman a "territory", consisting not of a geographical area but of certain enumerated customer accounts. The contract provided that the salesman was to be paid a weekly salary in a fixed amount plus "bonus credits" measured by sales in the "territory" (i.e. to the accounts) assigned to him, whether such sales were made by him or someone else. Bonus credits were computed as a percentage of the price of products sold (with different percentages for different products), subject to adjustments not now material. The salesman was to be paid a percentage of the bonuses thus computed: seventy-five percent if the territory was assigned to him at the date of the order, twenty-five percent if the territory was assigned to him at the date of delivery and installation, and one hundred percent if the territory was assigned to him at both times; provided that the salesman's "bonus interest in any order shall terminate... [i]f [with exceptions not material] shipment of the order is not made within eighteen months from the date of the order unless the [t]erritory is assigned to... [him] at the date of delivery and installation."[2]

---

50[a], 365 Mass. 814 [1974]; *Moy* v. *Jack Madden Ford Sales, Inc. ante,* 102, 107-108 [1976]), the defect was cured by the defendant's oral argument on the motion, which supplied the necessary detail (compare *Soares* v. *Lakeville Baseball Camp, Inc.* 369 Mass. 974, 974-975 [1976]).

[2] Other clauses provided that the plaintiff's "bonus interest shall be determined by the date of the order and whether the territory in which the sale is made *is* assigned to you for coverage or supervision at the date of delivery and installation, except in the case where the order does *not* include specific shipping and delivery instructions, in which case bonus credit shall vest in the salesman assigned to the territory at the date of delivery and installation... If delivery and installation is not made following shipment from the factory... within [thirty, sixty or ninety days, depending on the type of product]... your bonus interest... shall terminate... unless (a) The territory *is* assigned to you for coverage at the date of delivery and installation, or (b) The terri-

In 1968 the plaintiff's "territory" consisted of certain named chain stores in New England, including First National Stores, Inc. (First National). Around that time the defendant introduced a new type of cash register. The plaintiff arranged a demonstration of the new machine to executives of First National in October, 1968. On November 29 First National placed an order for 2,008 of the machines, with deliveries and payments to be spread over a period of four years. While the plaintiff did not personally negotiate the order, he was credited with it by reason of the "bonus credit" provisions of his contract.

In early 1969 the plaintiff was notified that his contract was terminated, effective December 2, 1968. He was permitted to remain in the defendant's employ thereafter in a "sales supportive" capacity at his previous weekly salary, but without a written contract and without an assigned territory. During the eighteen-month period following the order of November 29, 1968, 774 of the ordered machines were delivered to First National. The plaintiff received seventy-five percent of the bonus credit applicable to the machines so delivered, but the remaining twenty-five percent was denied him because he was no longer assigned as salesman to the First National account when the deliveries were made. In June, 1970, the plaintiff was discharged from the defendant's employ altogether. After that date an additional 729 cash registers were delivered to First National pursuant to the order of November 29, 1968, but the plaintiff received no bonus payments on them because they had not been delivered within eighteen months of the order.

---

tory *is not* assigned to you for coverage at the date of delivery and installation, and the delivery and installation *is* made within three months after the time when your commission interest would otherwise have terminated and at a time within eighteen months of the date of the order." The contract required the plaintiff, among other things, "[t]o devote ... [his] entire time to such employment," to furnish daily reports to the defendant on calls made by him, to maintain lists of actual and prospective users of the defendant's products in his territory, and to "collect all notes or accounts and upon request to repossess ... products" in his territory.

The defendant moved for a directed verdict at the close of the plaintiff's case and rested. Contrast *Martin* v. *Hall,* 369 Mass. 882, 884-885 (1976). Counsel for the defendant argued to the trial judge that the plaintiff could not recover under the first two counts because there was no evidence of any breach of the plaintiff's contract and that the existence of the contract precluded recovery on a quantum meruit under count 3. In denying the motion the judge ruled that there was sufficient evidence to present a jury question as to whether the defendant had terminated the contract and later fired the plaintiff in bad faith, and that a finding of bad faith would entitle the plaintiff to recover.[3] By agreement of counsel (the defendant, however, preserving its right to claim error in the denial of its motion for a directed verdict), the judge presented the case to the jury in the form of two questions Mass.R.Civ.P. 49[a], 365 Mass. 812 [1974]): "1.   Did the Defendant act in bad faith ... when it decided to terminate the Plaintiff's contract as a salesman by letter dated December 2, 1968, delivered on January 6, 1969?" and "2. Did the Defendant act in bad faith ... when the Defendant let the Plaintiff go on June 5, 1970?"[4] The jury returned affirmative answers to both questions, and the judgment was entered. Of the $45,649.62 adjudged due the plaintiff, $9,272.52 represented the twenty-five percent of the bonus credit denied the plaintiff for the 774 machines delivered to First National within eighteen months after the order had been placed, and the remainder represented one hundred percent of the credit payable for the 729 machines delivered thereafter.

---

[3] At one point the judge appears to have adopted the view that the issue of bad faith might be relevant only to the quantum meruit count. As the judgment ultimately entered did not specify the count or counts on which it was based, however, we assume for purposes of this opinion that it was based on all three counts.

[4] The judge instructed the jury that they could find that the defendant acted in bad faith if its action in either instance was taken for the purpose of escaping liability to the plaintiff for any part of the bonuses which would otherwise have been due him.

It is clear that the plaintiff's contract of employment as a salesman explicitly gave the defendant a power to terminate that employment at will, and that the plaintiff has been paid all the commissions to which the literal provisions of the contract entitled him. The plaintiff relies, however, on a line of cases[5] which hold that a broker engaged to find a buyer for real estate or merchandise may be entitled to his commission if the seller, prior to completion of all conditions which would entitle the broker to a commission, discharges the broker in bad faith in order to avoid paying him the commission for his services. For purposes of decision we assume that there was evidence to support the jury's finding, by its answer to the first question put[6], that the defendant terminated the plaintiff's contract as a salesman for the purpose of avoiding the incurring of further liability to the plaintiff under the contract for bonus credits applicable to the First National order. The question for decision is whether a termination for that purpose left the plaintiff entitled to the commissions he would otherwise have earned from the order.[7]

---

[5] Cadigan v. Crabtree, 186 Mass. 7 (1904). O'Connell v. Casey, 206 Mass. 520, 528 (1910). Waters v. Pacific Wool Prod. Co. 268 Mass. 83, 87-88 (1929). Siegel v. Lowe, 327 Mass. 154, 155-156 (1951). Dragone v. Dell'Isola, 332 Mass. 11 (1954). Malloy v. Coldwater Seafood Corp. 338 Mass. 554, 562-563 (1959). O'Malley v. Markus, 339 Mass. 766, 768-770 (1959). The plaintiff cites Eastern Paper & Box Co. Inc. v. Herz Mfg. Corp. 323 Mass. 138 (1948), as part of the same line of cases, although it goes off on wholly different principles.

[6] The second question, having to do with the termination of the plaintiff's employment, appears to have no bearing on entitlement to bonus credits. In addition, there is nothing in the record to suggest that the defendant delayed any deliveries so as to have them made after, rather than before, the expiration of the eighteen-month period.

[7] The defendant relies heavily on Gebhard v. Royce Aluminum Corp. 296 F. 2d 17 (1st Cir. 1961), in which the court, applying Massachusetts law, stated: "Pausing here, it is difficult to see how an agreement at will can be terminated in bad faith, other than with respect to nonpayment of commissions or other matters already accrued . . . It must be clear that when employment is at will the employer is free to terminate . . . at any time." 296 F. 2d at 18. The plaintiff in that case was primarily contesting the validity of his termination. The plaintiff in this case is not contesting the validity of his termination, but is asserting a right to receive commissions on the First National order irrespective of the termination.

At the outset we note two distinctions which lead us to question generally the applicability to the present case of the brokers' commission cases relied on by the plaintiff. The first is that those cases seem to involve unilateral contracts, and to arise from an offeror's attempted revocation of his offer to pay a commission for a specified result as the broker is nearing accomplishment of the result.[8] The rule applicable to unilateral contracts is that, until the offeree — in this context, the broker — accepts such an offer by tendering performance in accordance with its terms, no contract comes into existence. *DesRivieres* v. *Sullivan*, 247 Mass. 443, 446 (1924). *Elliott* v. *Kazajian*, 255 Mass. 459, 461-462 (1926). *John T. Burns & Sons, Inc.* v. *Hands*, 283 Mass. 420, 422 (1933). *Maher* v. *Haycock*, 301 Mass. 594, 596 (1938). *Eastern Paper & Box Co. Inc.* v. *Herz Mfg. Corp.* 323 Mass. 138, 140 (1948). *Bartlett* v. *Keith*, 325 Mass. 265, 268 (1950). *Dragone* v. *Dell'Isola*, 332 Mass. 11, 12-13 (1954). *Lattuca* v. *Cusolito*, 343 Mass. 747, 751-752 (1962). The line of cases on which the plaintiff relies is an exception to that rule, formulated to avoid inequities which would result if the offeror were permitted to take advantage of the rule by discharging the broker and closing the negotiations himself in order to avoid liability to the broker for a commission. The principle of those cases is discussed by leading commentators as an aspect of the law of unilateral contracts. See Corbin, Contracts, § 50, pp. 202-211 (1963); Williston, Contracts, §§ 60, 60A, pp. 185-193 (3d ed. 1957). The employment contract in the case before us, however, was bilateral from its inception, binding both parties in accordance with terms mutually agreed upon. It is questionable whether

---

[8] *Malloy* v. *Coldwater Seafood Corp.* 338 Mass. 554 (1959), on which the plaintiff relies most heavily (for the reason that it illustrates that the principle on which he relies applies not only in the case of a broker engaged for the purpose of effecting a single, isolated sale, but also in the case of a broker engaged on a continuing basis), is no exception: there the principal's agreement to pay its broker a commission on sales of its products was not supported by a promise by the broker to make such sales or by any other consideration, and hence was nothing more than an offer to enter into a series of unilateral contracts.

the line of cases upon which the plaintiff relies has any application in the context of bilateral contracts, where the question is not whether the defendant wrongfully prevented a contract from coming into existence, but whether the defendant's actions constituted a breach of a contract in being. Compare *Elliott* v. *Kazajian*, 255 Mass. at 462; *Eastern Paper & Box Co. Inc.* v. *Herz Mfg. Corp.* 323 Mass. at 140-141; *Coan* v. *Holbrook*, 327 Mass. 221, 223, n.1 (1951); *John T. Burns & Sons, Inc.* v. *Brasco*, 327 Mass. 261, 263 (1951).

The second factual distinction is that the plaintiff's line of cases is grounded on the concept that the principal should not be permitted to enjoy the product of the broker's efforts without paying the broker the compensation promised.[9] "An agent to whom the principal has made

---

[9] The broker might recover his commission "[i]f, in the midst of negotiations instituted by the broker, and which were plainly and evidently approaching success, the seller should revoke the authority of the broker, with the view of concluding the bargain without his aid, and avoiding the payment of commissions about to be earned ..." *Cadigan* v. *Crabtree,* 186 Mass. at 13, quoting from *Sibbald* v. *Bethlehem Iron Co.* 83 N. Y. 378 (1881). "Where the principal revokes the broker's authority in bad faith in order to secure to himself the fruits of the broker's work without paying him for it, the revocation, being in fraud of the broker's rights, is of no effect so far as those rights and the trade subsequently made are concerned." *O'Connell* v. *Casey,* 206 Mass. at 528. "The cases in which such bad faith has been found to exist are cases in which a sale has later been made. Profit from the plaintiff's exertions seems essential to proof of bad faith." *Elliott* v. *Kazajian,* 255 Mass. at 464. "... [S]uch discharge was not made in good faith, but was made to obtain the benefit of the plaintiff's efforts without paying for them." *Waters* v. *Pacific Wool Prod. Co.* 268 Mass. 83, 87 (1929). "Bad faith in such connection means a purpose on the part of the defendant to obtain without payment a profit from the plaintiff's exertions." *Brooks* v. *Gregory,* 285 Mass. 197, 205 (1934). "The jury could find that the plaintiff's efforts, though not extensive, were the efficient cause of the sale ... [and that the defendant] acted in bad faith, with the design to avail himself of the plaintiff's services without paying him." *Siegel* v. *Lowe,* 327 Mass. at 155. "The owner cannot act in bad faith, and that means that he cannot revoke the broker's authority for the purpose of avoiding the payment of a commission to him and then sell the property to the customer procured by the broker." *Dragone* v. *Dell'Isola,* 332 Mass. at 13. Contrast *RLM Associates, Inc.* v. *Carter Mfg. Corp.* 356 Mass. 718 (1969), a rescript opinion in which the court stated "RLM, entitled to a commission on any sale in the territory, was not bound to show to what extent it had contributed to obtaining the award [of a government procurement contract], although the evi-

a revocable offer of compensation if he accomplishes a specified result is entitled to the promised amount if the principal, in order to avoid payment of it, revokes the offer and thereafter the result is accomplished as the result of the agent's prior efforts." Restatement 2d: Agency, § 454 (1958). Under the contract before us, the entitlement of the plaintiff to bonus credits did not depend on his efforts or on his producing or accomplishing any particular result. His entitlement to credits depended, instead, simply on his being employed in a particular position or job slot at the time when orders were written or deliveries were made. In this context the policy underlying the brokers' commission cases is of greatly diminished vitality, if, indeed, it has any applicability at all.

Assuming, with the plaintiff, that those cases might have application to some cases of bilateral employment contracts, it is the opinion of a majority of the court that those cases have no application in this case because of the particular contractual provisions agreed to by the parties. One of those provisions expressly provided that either party could terminate the contract "at will and without cause." Another provision plainly contemplated that the defendant could change the plaintiff's territory and, in consequence thereof, his bonus entitlements after orders had been obtained.[10] Following the termination of the contract, the plaintiff was paid seventy-five percent of the

dence warranted the conclusion that RLM's efforts were as significant in this respect as could reasonably have been possible in this type of government procurement." The present case might be more factually analogous to the *RLM* case if the defendant had terminated the plaintiff's salesman contract the day before the First National order was taken in order to avoid liability for seventy-five percent of the bonus credits applicable to the first eighteen months' deliveries.

[10] The evidence indicated that the plaintiff, previous to his being assigned the New England territory, had been assigned to a territory in Minnesota, and in consequence of his transfer had forfeited bonus credits he would have been paid had he remained in Minnesota. Conversely it is plain that the terms of the contract entitled him to receive bonus credits applicable to deliveries in his territory of machines ordered during the tenures of previous salesmen and delivered within eighteen months of the order.

bonuses arising from the cash registers ordered by First National and delivered within eighteen months. The plaintiff's contract entitled him to no more. The contract purports to set out in full the rights and obligations of both parties, and is binding upon them in accordance with its terms regardless of any undisclosed misunderstanding which the plaintiff might have entertained as to the powers of the defendant thereunder. See *Canney* v. *New England Tel. & Tel. Co.* 353 Mass. 158, 165 (1967). We are not justified in rewriting the contract. *Van Dusen Aircraft Supplies of New England, Inc.* v. *Massachusetts Port Authy.* 361 Mass. 131, 143 (1972). "If there was hardship here, it was due to the contract itself and to its failure to afford the plaintiff more adequate protection against termination." *Shain* v. *Washington Natl. Ins. Co.* 308 F. 2d 611, 616 (8th Cir. 1962).

As to count three of the amended declaration, in which the plaintiff claims that the defendant "owes him the reasonable value of services performed" by him in connection with the First National order, there was no evidence that the defendant ever expressly or impliedly promised to pay the plaintiff the "reasonable value" of any "services" rendered by him. What the defendant promised was a bonus for orders obtained and deliveries made in accordance with, and subject to the conditions imposed by, the written contract. Either the defendant was liable for such a bonus or it was not liable at all. *Lattuca* v. *Cusolito,* 343 Mass. at 752. *Gaynor* v. *Laverdure,* 362 Mass. 828, 840 (1973). See *John T. Burns & Sons, Inc.* v. *Brasco,* 327 Mass. at 263. It follows that the plaintiff was not entitled to recover under count three.

> *Judgment reversed.*
> *Judgment for the defendant.*

This case was initially heard by a panel composed of the Chief Justice and Justices Goodman and Armstrong and was thereafter submitted on the record and briefs to Justice Grant (Justice Keville not participating) who took

part in this decision in accordance with the provisions of Rule 1:18 of this court.

GOODMAN, J. (dissenting). The jury found, and the majority is willing to assume (as stated in its opinion at 390) that the defendant "terminated the plaintiff's contract as a salesman for the purpose of avoiding the incurring of further liability to the plaintiff under the contract for bonus credits applicable to the First National order," and thus acted in bad faith. But the majority reads out of the contract the "implied covenant ["in every contract"] that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract, which means that in every contract there exists an implied covenant of good faith and fair dealing." Druker v. Roland Wm. Jutras Associates, Inc. 370 Mass. 383, 385 (1976), quoting from Uproar Co. v. National Bdcst. Co. 81 F. 2d 373, 377 (1st Cir.), cert. den. 298 U. S. 670 (1936). Restatement 2d: Contracts, § 231 (Tent. Drafts Nos. 1-7, 1973). ("Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement.") I do not believe the extraordinary reading the majority gives to this "Salesman's Contract" is warranted by the provisions that allow either party to terminate the contract at will "with or without cause," and the defendant to change the salesman's territory "at any time." See Gebhard v. Royce Aluminum Corp. 296 F. 2d 17, 18 (1st Cir. 1961). It is precisely to provisions such as these, where one party is given a wide discretion, that a good faith limitation would seem particularly applicable. See, e.g., Chandler, Gardner & Williams, Inc. v. Reynolds, 250 Mass. 309, 314 (1924); Krauss v. Kuechler, 300 Mass. 346, 349 (1938); G. L. c. 106, § 1-208 (Uniform Commercial Code). See also Restatement 2d: Contracts, § 254, comment a (Tent. Drafts Nos. 1-7, 1973). See generally, Corbin, Contracts, § 644 (1960) ("Promises Conditional on Personal Satisfaction"); Williston, Contracts, § 675A (3d ed. 1961) ("Promise Conditional on Satisfaction", especially pp. 189-191).

The plaintiff knew, of course, when he entered into this contract, that his employment could be terminated and that his territory could be changed, but he had a right to assume that when the defendant exercised its prerogatives, it would not do so in order to avoid its undertakings to pay bonus credits in the future. Without a requirement of good faith dealing, such a future undertaking becomes not "additional compensation" as the bonus structure is characterized in the "Salesman's Contract", but illusory. *Blish v. Thompson Automatic Arms Corp.* 30 Del. Ch. 538, 569 (Sup. Ct. 1948). See also Restatement 2d: Contracts, § 79, comment a (Tent. Drafts 1-7, 1973) ("Illusory promises"), and material cited from Restatement 2d: Contracts, § 254, Corbin, and Williston above.

Further, the implication in the majority opinion that parties may contract themselves out of an obligation of good faith dealing seems to me to be unsound. It runs counter to the Uniform Commercial Code which provides in c. 106, § 1-203 (tracked in § 231 of the Restatement 2d quoted above), that "[e]very contract or duty within this chapter imposes an obligation of good faith in its performance or enforcement," and further (in § 1-102) that "the obligations of good faith, diligence, reasonableness and care prescribed by this chapter may not be disclaimed by agreement." Compare Restatement: Contracts, § 575 (1) (1932) ("A bargain for exemption from liability for the consequences of a willful breach of duty is illegal ...."). Certainly employment contracts, in which the parties are probably less likely to have equal bargaining power, should not have less stringent guarantees of fair dealing.

Finally, I see no distinction in principle between the present case and *RLM Associates, Inc.* v. *Carter Mfg. Co.* 356 Mass. 718 (1969), which, as the record in that case reveals, also involved a detailed, written "agreement" signed by both parties which could "be cancelled by either of the two parties upon thirty days written notice." That case seems to me to answer the suggestion in the majority opinion that a duty of good faith dealing may be applicable only to unilateral contracts and not ordinary bilateral con-

tracts. See also *Eastern Paper and Box Co. Inc.* v. *Herz Mfg. Corp.* 323 Mass. 138, 142 (1948). *RLM Associates* also disposes of the suggestion that the principle of good faith dealing is somehow restricted to the type of unjust enrichment usually found in the brokerage cases. In *RLM Associates* the court noted: "RLM, entitled to a commission on any sale in the territory, was not bound to show to what extent it had contributed to obtaining the award . . .." Furthermore, the record in this case discloses evidence from which the jury could have found that the plaintiff had cultivated the First National Stores account over a long period, and had laid the ground work for what he characterized as a "once in a lifetime sale."

Because the jury could have believed that the defendant's termination of the plaintiff's contract was motivated by a desire to avoid the paying of commissions I believe the case was properly submitted to the jury.