FRANCIS P. MALLOY *vs.* COLDWATER SEAFOOD CORPORATION.

Suffolk. November 7, 1958. — February 11, 1959.

Present: WILKINS, C.J., WILLIAMS, COUNIHAN, WHITTEMORE, & CUTTER, JJ.

*Broker*, Commission. *Contract*, With broker, Modification. *Law or Fact. Practice, Civil*, Auditor: findings; Exceptions: whether error harmful. *Error*, Whether error harmful. *Evidence*, Auditor's report, Prima facie evidence, Contradiction of witness. *Witness*, Contradiction.

In an action by a broker to recover commissions on sales of blocks of frozen fish made by the defendant to three customers on orders taken by the defendant directly from them about a month after it had cancelled a brokerage contract with the plaintiff wherein a right of cancellation at will was reserved by the defendant, evidence that by the time of the cancellation an intense demand for the blocks had developed in the trade, that the cancellation came in the midst of negotiations of the plaintiff with the three customers which were approaching success as a result of his efforts in the preceding months, and that the defendant realized that the impending sales would be under the contract with the plaintiff and desired to avoid paying commissions to come due thereon, but wished the plaintiff under a new contract to procure as customers persons not already in contact with the defendant

warranted findings of bad faith on the part of the defendant in cancelling the contract and of its liability to the plaintiff for commissions on the sales to the three customers. [561–562]

Where it appeared that under a contract to act as the defendant's broker in the sale of frozen fish the plaintiff was in the midst of negotiations with three customers which were approaching success when the defendant exercised a right reserved in the contract to cancel it, and that shortly thereafter the plaintiff and the defendant entered into a new brokerage contract which "excluded from . . . commission" sales to the three customers but did not deal expressly with sales thereafter made by the defendant to them as a result of such negotiations under the earlier contract, a contention by the defendant that the new contract "eliminated any question of bad faith" on its part in cancelling the earlier contract and precluded the plaintiff from recovering commissions on the sales resulting from the earlier negotiations was without merit. [564]

It was incorrect to charge a jury that a finding by an auditor, after evidence to the contrary appeared, retained its artificial force as prima facie evidence "unless and until the jury . . . [found] from" the other evidence that the auditor's finding was wrong. [564–565]

At the trial of an action by a broker to recover commissions on sales made by the defendant on orders received about a month after the defendant had cancelled the brokerage contract with the plaintiff, there was no error prejudicial to the defendant in the admission in evidence of a paragraph of an auditor's report in which he improperly left it to the court to determine as matter of law whether in the circumstances the defendant had acted in bad faith in cancelling the brokerage contract, instead of making a finding on that issue, and found that if the defendant acted in bad faith the plaintiff would be entitled to the commissions, where the judge instructed the jury in substance to disregard the auditor's "remarks" on the issue of bad faith and to decide that issue independently. [565–566]

At the trial of an action by a broker for a commission, where the jury were properly instructed on the issue whether or not the plaintiff was entitled to a commission, an instruction leaving to them the question whether the commission, if any, was at a certain rate supported by the evidence or at a certain lesser rate was erroneous in that there was no basis in the evidence for the lesser rate, but such erroneous instruction, followed by a verdict for the plaintiff for a sum much less than that which could have been found due at the greater rate, was not prejudicial to the defendant. [566–567]

At the trial of an action by a broker to recover commissions for sales allegedly negotiated by him for the defendant corporation under a brokerage contract made through its president, there was no error in admitting in evidence statements of the president before an auditor inconsistent with his testimony at the trial where the circumstances of the prior statements were adequately mentioned to the witness and he was asked if he had made them and was allowed to explain them. [567]

At the trial of an action by a broker to recover commissions on sales of a certain kind of frozen fish allegedly negotiated by the plaintiff with three customers of the defendant, there was no prejudicial error in the exclusion of evidence offered by the defendant that fish of that kind sold to another customer was not "available for sale to anybody" where the defendant had fully made its point that it had no fish of that kind on hand for delivery in the period when the plaintiff was conducting his negotiations. [567]

CONTRACT. Writ in the Superior Court dated February 3, 1955.

The action was tried before *Bolster, J.*

*Daniel A. Lynch, (Alfred J. Bedard,* of New York with him,) for the defendant.

*John Kimball, Jr., (Earle C. Cooley* with him,) for the plaintiff.

WHITTEMORE, J. The plaintiff had a verdict in this action of contract to recover broker's commissions for the sale of frozen fish. The defendant's exceptions are to the denial of certain requests, to rulings in respect of an auditor's report and other evidence, to parts of the judge's charge, and to the denial of a motion for new trial.

We state the facts as the jury could have found them, viewing the evidence most favorably for the plaintiff. The terms of the plaintiff's employment are set out in a letter from the defendant's president in New York, Jon Gunnarsson, dated August 8, 1952, which recited that the plaintiff was to "act as our broker" in the New England States, that he would be "protected for any direct sales we make" in the territory, that his commission was to be five per cent, and that "[t]his arrangement can be terminated by us at any time, without prior notice. You need not be afraid, however, that we will terminate this agreement with you, if you show us satisfactory progress, as we do not change brokers unless we are forced to do so. . . . As you know, we have the finest seafood in the world and the possibilities in your territory for exploitation of this market, for our line of fillets is unlimited." A subsequent letter excluded from commission sales made by the defendant to the "A. & P. Tea Co." It was not then contemplated by the defendant

Malloy v. Coldwater Seafood Corp.

that the plaintiff's sales were to be restricted as to types or amounts of the defendant's products. The defendant was a wholly owned subsidiary of Icelandic Freezing Plant Corporation. It handled that corporation's sales in the United States and was then offering in New England certain trade marked fillets, principally, but also some parchment wrapped seven pound fillets not then used in New England for industrial purposes. It did not then carry or sell the unwrapped, ice glazed, cod blocks which later became important, and in 1953 its price lists did not include that item.

Beginning late in 1952 various concerns became interested in the prospects of the "fish stick" business, that is cutting cod or haddock or like fish into small bars, frying the bars in batter, packaging and freezing the resulting sticks for retail sale. The plaintiff had difficulty in selling the defendant's trade marked products because of competition and the demand for fish sticks. He knew that the defendant beginning in 1953 was supplying specified glazed cod blocks to a customer in New York and one in Philadelphia who were experimenting with fish sticks. Beginning in January, 1953, in calls two, three or four times a week, the plaintiff sought to get three customers of the defendant, Gorton-Pew Fisheries Company, Ltd. (Gorton-Pew), O'Donnell-Usen Fisheries (O'Donnell-Usen), and Fulham Bros., Inc. (Fulham), to buy from the defendant blocks for making fish sticks. There were several sources for frozen fish blocks known to the trade generally, in addition to the defendant, but none of these three concerns made any inquiry for frozen blocks except to the defendant. The plaintiff told Gunnarsson about these prospects in frequent telephone conversations from January to October, 1953. In May Gunnarsson told the plaintiff that "when he started to get orders, Coldwater would have the fish and if it were not packed in seven pound blocks, it would be as soon as demand for blocks increased in New England." In August, 1953, the plaintiff sold a sample case of parchment wrapped skinless cod blocks and also a sample case of the seven pound glazed cod blocks to Gorton-Pew. On August 29 or 30 the plaintiff told Gunnars-

son by telephone that the parchment wrapped blocks were unsatisfactory but that the glazed block would take the place of the cod the producers could not get locally. Gunnarsson replied, "Keep hammering away at them. We have the fish. It is up to you to start closing some substantial business up there. From what you say there are strong indications that they are going to need us." Gunnarsson also said that some glazed cod blocks would be available from an arrival expected in a few days. In August or September, 1953, the plaintiff began to negotiate also with General Seafoods Corporation (Seafoods) and told Gunnarsson that he was negotiating with a customer for substantial orders of four named items of the defendant's production but without mentioning Seafoods' name. In the middle of September the plaintiff told Gunnarsson that O'Donnell-Usen was rapidly using up its own supply and the plaintiff should be able to get some of its business as he had been talking with it since early summer. Gunnarsson told him "to keep pounding away at them." The plaintiff also at about that time told Gunnarsson that Fulham was using up their blocks; and that he had been in "practically daily contact" with that firm and it was just a matter of days or weeks before he would be able to sell them substantial quantities of blocks. Gunnarsson said to keep in touch with them, and let him know what was going on. On September 30, 1953, the plaintiff obtained and sent to the defendant an order from Gorton-Pew for 40,000 pounds of glazed cod blocks and was paid a commission on this order in the modified form in which it was filled. He then wrote the defendant about the prospects of an order from this customer of 100,000 pounds per month for at least three months. In connection with the order of September 30 the defendant, through one Hawthorne, called Gorton-Pew and as a result took an order which was filled by shipments of 100,016 pounds from October 19 through October 23. A commission was not paid on this order.

At some time prior to October 8, 1953, Gunnarsson took an order by telephone from a vice-president of O'Donnell-

Usen for block cod fillets which was filled by delivery on October 21, 1953, of 70,000 pounds. No commission was paid on this order.

On October 9, 1953, the plaintiff told Gunnarsson by telephone that he expected large orders from Seafoods for specially packed blocks. He then revealed the name of this customer for the first time. Gunnarsson thereupon spoke with the production manager of Seafoods and learned that the negotiations involved the purchase of a large part of the defendant's entire production. On October 9 the defendant wrote the plaintiff that it was therewith cancelling the brokerage arrangement but that the plaintiff could continue as a broker for "the sale of our regular brands . . . in consumer and restaurant packs," but that the defendant would not pay any commission on block frozen merchandise for industrial purposes. The letter also stated that "it was never our intention . . . that you should sell bulk merchandise for industrial purposes," and that a commission could not be paid on the sale of bulk merchandise to Seafoods but that "if your present negotiations result in trade, we are open to discuss some remunerations to you." The plaintiff and Gunnarsson met in Boston on October 14, 1953, and made a new oral contract, which as thereafter modified was embodied in a letter from the defendant of October 29, 1953. This letter stated, "As you have expressed the desire to continue to work for us as a broker, we want to explain more fully how we want these arrangements to be. You are to receive full protection on all sales to all companies with the exception of A & P Food Stores on our retail, five-pound and fifteen-pound cello-pack merchandise — both Fresher and Icelandic Brands. However, excluded from commission are sales of bulk frozen merchandise for industrial use, for instance our regular 8/7 blocks. Commission on such bulk pack for sales to the following companies are excluded from any commission to you: Gorton-Pew Fisheries, Ltd., General Seafoods Corp., O'Donnell-Usen Fisheries, A & P Food Stores, Fulham Brothers. We will grant you commission on sales of bulk frozen merchan-

dise to other firms in your territory, but if the quantities are 100,000 pounds or over, the commission will be reduced to 2½ per cent." The plaintiff made sales for the defendant and received commissions under the contract of October 29, 1953, until January 25, 1954, when the defendant terminated the agreement. The plaintiff received monthly statements of his commissions earned and a check therefor.

In November, 1953, the defendant, without the participation of the plaintiff, took and filled orders for sale and delivery of frozen cod blocks throughout the year 1954 as follows: from Gorton-Pew, 2,400,000 pounds; from O'Donnell-Usen, 1,600,000 pounds; from Fulham, 4,800,000 pounds. O'Donnell-Usen also bought 30,000 pounds for immediate delivery. No commission was paid to the plaintiff on these sales.

Testimony by Gunnarsson relevant to the exceptions was as follows: Gunnarsson cancelled the brokerage contract because of the plaintiff's extremely poor sales record and because the plaintiff told him on October 9, 1953, that he had been attempting to negotiate with Seafoods for a large part of the defendant's production for which the plaintiff did not have any authority. "He did not write or speak to Malloy before October 9, 1953, to complain of or concerning Malloy's sale record; he let it slide." "As of January 19, 1954, when he testified before the auditor he recognized that at least part of his reason for cancelling Malloy's brokerage contract was to eliminate Malloy from commissions from Gorton-Pew." He did not cancel in order to eliminate the plaintiff from commissions on Gorton-Pew, O'Donnell-Usen and Fulham. Subject to exception of the defendant and on the statement of the plaintiff's counsel that he was offering a previous inconsistent statement, Gunnarsson was allowed to answer that he had testified before the auditor that he wanted to eliminate the plaintiff from commissions on the business of these three concerns, and of Seafoods. This testimony required explanation, that is, he did not want to eliminate payment of commissions but simply to exclude the plaintiff from selling the fillets for industrial use

to these customers; he did not want the plaintiff to sell bulk merchandise to them and he made a new agreement under which the plaintiff could sell bulk merchandise to anybody but these four and the "A & P Tea Company."

The auditor found that about October 9, 1953, "Gunnarsson realized that the growth of the fish stick development had so changed conditions . . . that a broker for . . . glazed blocks of white fleshed fish . . . was no longer necessary. It was no longer necessary to stimulate demand for such products. The pressing demand evidenced by the orders and interest of the concerns mentioned . . . indicated that the plaintiff's services were no longer needed."

The auditor found that commissions were due on the three small sales, two to Gorton-Pew and one to O'Donnell-Usen, made before October 9, 1953, and that if the court should rule that the defendant cancelled in bad faith, commissions were also due on the sales made in November, 1953.

1. No error is shown in the denial of requests for instructions.

The defendant contends that the judge should have instructed, as requested, that there was no evidence to warrant a finding of bad faith or findings that commissions were due for sales to the three customers made after October 9, 1953, and that sales to the three customers after that date did not warrant a finding of bad faith. We disagree.

The jury could have found that the cancellation on October 9, 1953, came in the midst of negotiations with the three customers which were approaching success as a result of the plaintiff's efforts in the preceding months and that the motive was in part at least to avoid paying the commissions which would be due when the impending orders were placed. The jury could have found that the defendant had recognized that these orders would be under the August 8, 1952, contract.

The jury could have found also that the new contract showed that the defendant wished the plaintiff to procure as customers for frozen blocks for industrial use any persons

other than those who were already in contact with the defendant. Gunnarsson's testimony that he recognized on January 19, 1954, that a part of his reason for cancelling was to eliminate commissions on Gorton-Pew sales was not objected to or limited in its use. The denials to the jury of this motive could be disbelieved. The defendant did not request that the additional statements of Gunnarsson as to his testimony before the auditor, which had been received as inconsistent statements, be limited in their use. See *Salonen* v. *Paanenen*, 320 Mass. 568, 575. It was for the jury to say on the conflicting evidence whether the plaintiff's efforts had contributed to making the three firms probable customers and whether they were on October 9 very probable customers for their 1954 needs without much further sales effort, or whether the great need of these firms for the product had made them customers without any significant effort of the plaintiff. The auditor's finding does not negative the permissible inference that the plaintiff's efforts had confined the interest of these customers to the defendant among the available sources.

A conclusion that the defendant realized in October that it had not needed the services of a broker for the sale of frozen blocks because of the intense demand would have been reasonable, particularly in view of the auditor's finding, but it would not show that the plaintiff had not done some effective work nor that the defendant was not motivated by a desire to avoid paying commissions. On the contrary, it would support an inference that the defendant desired so far as possible to avoid paying commissions on business which, as it turned out, it could probably have had anyway.

The judge, in a very full and careful statement, instructed correctly in respect of the meaning and effect of bad faith as applied to the relevant evidence. He told the jury inter alia that a motive in cancelling to deprive the broker of commissions he would otherwise receive would be evidence of bad faith, and that if bad faith was found the plaintiff could have a commission even though not the efficient cause

of the sale. He also charged conversely that "if you find that the defendant acted in good faith, not seeking to escape the payment of commissions but motivated fairly by a view of its own interests, it had the absolute right before a bargain was made and while negotiations remained unsuccessful, before commissions were earned, to revoke the plaintiff's authority and the plaintiff cannot thereafter claim compensation for a sale made by the defendant even though it be to a customer with whom the plaintiff unsuccessfully negotiated and even though to some extent the defendant might justly be said to have availed itself of the fruits of the plaintiff's labor. . . . [I]n considering the question whether there was good or bad faith . . . you should consider the conduct of the parties both prior to and subsequent to October 9 in order to test in your minds how that may affect your determinations. . . . [I]f you are to find bad faith, the plaintiff must satisfy you by the fair preponderance of the believable evidence that there was bad faith here which will enable him to recover." He also instructed that it was for the jury to say just how the transactions with the three customers affected the case.

This was a proper statement of the applicable law. *Cadigan* v. *Crabtree,* 186 Mass. 7, 13. *O'Connell* v. *Casey,* 206 Mass. 520, 527–528. *Waters* v. *Pacific Wool Prod. Co.* 268 Mass. 83, 87–88. *Leitner* v. *Foster,* 280 Mass. 128, 135–137. *Siegel* v. *Lowe,* 327 Mass. 154, 155–156. Compare and see statement of the same rule in *Leonard* v. *Eldridge,* 184 Mass. 594, 595–596; *Elliott* v. *Kazajian,* 255 Mass. 459, 462; *Brooks* v. *Gregory,* 285 Mass. 197, 205; *Kacavas* v. *Diamond,* 303 Mass. 88, 93. We are not impressed with the defendant's contention that the "rule of 'bad faith revocation' applicable to other brokerage situations has no application here." That there was a continuing relationship made the plaintiff no less a broker. See *Eastern Paper & Box Co. Inc.* v. *Herz Mfg. Corp.* 323 Mass. 138, 140.

The judge was not obliged to tell the jury that the sales to each of the three customers after October 9, 1953, considered apart from other evidence, did not warrant a finding

of bad faith. The fact that these sales were made in November was relevant in determining whether they appeared to be impending in early October. The sales were relevant to the issue, and the charge adequately and fairly indicated their relevance.

2. The defendant, after the charge, claimed an exception to "the refusal of the court to rule that the new agreement . . . confirmed by a letter of October 29, 1953 . . . eliminated any question of bad faith from this case." This ruling had not, in terms, been requested. In any event it was not error to decline to give it. The agreement of October 29, 1953, did not deal expressly with sales which might be made in closing negotiations in which the plaintiff had participated, and it was not expressed in terms as a waiver, a release, an election, or an accord and satisfaction. There was an issue of fact which was not dependent upon interpretation of the words of the letter. *Way* v. *Greer,* 196 Mass. 237, 246–247. *Rizzo* v. *Cunningham,* 303 Mass. 16, 20–21. *Worcester Color Co.* v. *Henry Wood's Sons Co.* 209 Mass. 105, 110. *Rosenblatt* v. *Holstein Rubber Co.* 281 Mass. 297, 301. *First Natl. Bank* v. *Cartoni,* 295 Mass. 75, 78. *Champlin* v. *Jackson,* 313 Mass. 487, 489. Compare *Atwood* v. *Boston,* 310 Mass. 70, 75. See *Metropolitan Transit Authy.* v. *Railway Exp. Agency, Inc.* 323 Mass. 707, 709. All the evidence of what happened between the parties beginning with October 9, 1953, was relevant to the issue of whether the plaintiff had so acted as to relinquish whatever rights accrued to him on October 9 if the cancellation was in bad faith. We pass the point that no affirmative defence was pleaded. To the extent that the issue was open the defendant would have been entitled to instructions to guide the jury in determining those facts which, if found, would in law show that he had given up the right of action now sued on, and in returning a proper verdict on such findings. But no requests pertinent to these issues were presented.

3. The defendant asserts error in, but took no exception to, that part of the judge's charge which stated the effect of the auditor's report. The judge should have charged that

an auditor's report retains its artificial legal force as prima
facie evidence only until evidence appears that warrants a
finding to the contrary (*Cook* v. *Farm Serv. Stores, Inc.* 301
Mass. 564, 566) rather than that such force remains "unless
and until the jury finds from the . . . evidence . . ., except
the auditor's report, that the auditor in your opinion in that
particular respect was not correct." But the point is not
open in the absence of an exception. *Concannon* v. *Com-
missioner of Pub. Safety,* 324 Mass. 503, 508.

4. There was no error in permitting the plaintiff's counsel
to read to the jury the last two paragraphs of the auditor's
report. These paragraphs read as follows: "If it can be
ruled as a matter of law that, under the circumstances out-
lined above, the defendant acted in bad faith, the plaintiff
would be entitled to commissions on the following sales:

| Order Placed | Customer | Pounds | Price | Total Sales |
|---|---|---|---|---|
| Nov. 17, 1953 | Gorton-Pew | 2,300,000 | 23½ | $   564,000.00 |
| Nov. 15, 1953 | O'Donnell-Usen | 30,000 | 23½ | 7,050.00 |
| Nov. 18, 1953 | O'Donnell-Usen | 1,600,000 | 23½ | 376,000.00 |
| Nov. 13, 1953 | Fulham Brothers | 4,800,000 | 23½ | 1,128,000.00 |

"It is also submitted that in the event the court rules
that the defendant acted in bad faith and that commissions
on the above sales are due the plaintiff, there remains a
further question for the court's determination as to whether
those commissions are to be computed on the basis of five
per cent stipulated in the original contract, or on the basis of
two and one half per cent provided for in the amended con-
tract, October 29, 1953, under which the plaintiff continued
to work as the defendant's broker until the 'final cancella-
tion January 25, 1954."

It was not for the court, but for the fact finder, to deter-
mine bad faith. This was an issue on which the auditor
should have made a finding. But it could not prejudice the
defendant before the jury to know that the auditor had not
made a finding because, mistakenly, he thought that the
court must rule. It could not be prejudicial to have the
jury know that the auditor had made a partial finding of

fact in respect of the important ultimate fact of the case. The auditor was performing a proper function when he answered the question whether, if there was bad faith, commissions had become payable on the November sales. The judge told the jury that in determining the issue of bad faith they "should not pay any attention to the auditor's remarks on that point; but should approach it from your own point of view and decide the question of good or bad faith not implying from the language of the auditor whether or not he so found." If there was any risk of prejudice it was adequately met by this statement.

It was not prejudicial for the jury to know that the auditor thought that there was a legal question concerning the rate at which the commission should be computed. See point 5, next following.

5. The judge in the charge read the two concluding paragraphs of the report above set out, except for the detail of the four November sales, and said, "[T]he court is not going to rule whether or not the defendant acted in bad faith because that is a question for you to decide. And, in addition, it is also for you to decide whether or not, if anything is due the plaintiff from the defendant, because of these sales referred to in the second group . . . [the November sales] it was agreed that a commission there would be at five per cent or two and one half per cent."

We do not discern in the evidence a basis to support a finding that the plaintiff, without waiving all right to a commission on the sales to the three customers, had nevertheless agreed to demand only two and one half per cent. Such right as he had stemmed from the letter of August 8, 1952, which called for five per cent. If the letter of October 29, 1953, was applicable, it specified that there be no commission on the sales to these customers. The plaintiff had testified that on October 14, 1953, Gunnarsson had said, "We are not going to pay five per cent on these large bulk sales . . . [but that] the commissions on these sales would be about one half of what he was getting" without mention of any specific customer. But there is no evidence of any agree-

ment on these terms or that the conversation had any significance except as a preliminary negotiation leading to the written contract of October 29.

We do not think, however, that the defendant was harmed by the wrong instruction. The jury were properly instructed that they could find no commissions on these sales unless they found bad faith. The instruction given allowed the jury to find for the plaintiff for about one half of what, if anything, was due. The verdict was for much less than what could have been found due at five per cent. We cannot assume that the possibility of making an award at the rate of two and one half per cent contributed in any degree to an incorrect resolution of the issue of bad faith.

6. There was no error in admitting the evidence of the testimony of Gunnarsson before the auditor. The circumstances of the prior statements were adequately mentioned, the witness was asked if he had made the statements, and he was allowed to explain them. G. L. c. 233, § 23. *Nelson* v. *Imperial Water Proof Co. Ltd.* 224 Mass. 388. *A. T. Stearns Lumber Co.* v. *Howlett,* 239 Mass. 59, 61. *Wheeler* v. *Howes,* 337 Mass. 425, 427. See *Whipple* v. *Rich,* 180 Mass. 477, 479.

7. There was no error in declining to permit Gunnarsson to answer, "No," to the question, "Were those blocks that were shipped over here under contract to Mrs. Paul's Kitchen available for sale to anybody in the United States?"

Manifestly if the blocks were under contract to Mrs. Paul's Kitchen, the defendant could not divert them, and if the question intended to inquire whether the customer was reselling them, it was objectionable on the ground of a collateral issue stated by the judge in colloquy. In any event the defendant's point was fully made that it had no blocks on hand for delivery in 1953 in the period when the plaintiff was conducting his negotiations. Gunnarsson had already testified that such blocks were not offered for sale in New England through the plaintiff or otherwise and later testimony showed that one case of the blocks held in New York for Mrs. Paul's Kitchen was sold to Gorton-Pew in August,

1953, and that in the first shipment to O'Donnell-Usen about October 19, 1953, "the blocks were borrowed from . . . [that] supply."

8. There was no error in denying the motion for a new trial.

*Exceptions overruled.*