ERNEST LAURENDEAU & another[1] vs. KEWAUNEE SCIENTIFIC
EQUIPMENT CORPORATION & another.[2]

Bristol.    September 20, 1983. — November 22, 1983.

Present: KASS, CUTTER, & SMITH, JJ.

*Contract,* What constitutes, Performance and breach.  *Unlawful Inter-
ference.*

In a contract action against a manufacturer of institutional furniture by a
    subcontractor who had made installations for the manufacturer for a
    number of years, evidence concerning the usual arrangements be-
    tween the plaintiff and the defendant permitted the jury to find that
    the defendant had made a continuing offer to the plaintiff to perform
    whatever installations were requested by certain acknowledgements
    sent to the plaintiff, and that, consequently, the defendant breached
    contracts with the plaintiff by reassigning to another subcontractor
    certain installation work for which the plaintiff had received acknowl-
    edgements. [120-121]
In an action for malicious interference with advantageous contractual
    relations against an employee of a manufacturer of institutional furni-
    ture brought by a subcontractor who had been performing installation
    work for the manufacturer, there was no evidence to warrant a finding
    that the employee had acted with malice in reporting to his superiors
    certain complaints about the plaintiff's work and in recommending that
    the manufacturer cease dealing with the plaintiff. [121-124]
In an action against a manufacturer of industrial furniture by plaintiffs
    who had performed installation work for the manufacturer for a num-
    ber of years, the judge properly directed a verdict for the defendant on
    a paragraph of the complaint which averred, in general terms, that
    the defendant was liable under an oral contract with the corporate
    plaintiff, that the defendant had a fiduciary relationship with the
    plaintiffs, and that the defendant had violated G. L. c. 93A, the Con-
    sumer Protection Act, in dealing with the plaintiffs. [124-125]
In an action against a manufacturer of industrial furniture by a subcon-
    tractor seeking to recover that portion of a disputed amount not paid
    to it for installation of furniture at a university, there was no error in

[1] Yankee Installations, Inc., a Massachusetts corporation.

[2] Kenneth Trudeau.

the judge's instruction to the jury on the issue of accord and satisfaction. [125]

CIVIL ACTION commenced in the Superior Court Department on May 5, 1980.

The case was tried before *Mone, J.*

*Philip N. Beauregard* for the plaintiffs.

*Robert C. Gerrard (James A. G. Hamilton* with him) for the defendants.

CUTTER, J. The corporate defendant (Kewaunee) makes and sells institutional and laboratory furniture for use by academic institutions and hospitals. In 1964, Laurendeau, a carpenter, without any firm assurance of the extent of available installation work, caused Yankee Installations, Inc. (Yankee), to be formed. Thereafter, Yankee did most of Kewaunee's school installation work in New England (except Vermont and Connecticut) up to 1979, but remained free to do work for others. For many years prior to 1979, installation subcontractors, including Yankee, did this work for the installation cost set up by Kewaunee on each order. This cost was fixed at a percentage (at one time, 15 %) of the list price of the furniture sold to the institution giving Kewaunee an order. Some of Kewaunee's dealers had the capacity to install the furniture sold by them. Others did not have that capacity, so that Kewaunee had to seek installation subcontractors to do the installations of furniture sold by such dealers. Yankee did not do Kewaunee's industrial and hospital installations.

Yankee long had been urged by Kewaunee to bid for the installation work done by it, but Laurendeau took the position that he did not know how to bid and would not bid. In the later 1970's, because of the diminishing volume of institutional furniture business, and in consequence of its increasingly competitive nature, Kewaunee became insistent that Yankee and its other installers bid for the installation work. The cost of installation, of course, directly affected Kewaunee's (and its dealers') ability to bid low enough to obtain institutional contracts.

In 1979, Kewaunee's district sales manager, the defendant Trudeau, told Charles Hyde, then a Kewaunee sales representative in New England, that all installers would be required to make competitive bids before they would be awarded installation contracts. Hyde, a friend of Laurendeau for twenty years, told Laurendeau of this instruction. Trudeau even suggested to Laurendeau in September, 1979, that he go to Kewaunee's North Carolina headquarters for instructions on how to estimate and bid.

During the period prior to 1979, the practice was for Kewaunee to prepare a list of the materials which it had agreed to provide as soon as a contract was made with an institution. A copy of each such list (known as an "acknowledgement" form) would be sent to Kewaunee's usual installer in the territory where the materials were to be used. This would happen from six to eighteen months before any shipment of materials would begin. If Yankee received such an "acknowledgement," Laurendeau would open a file and do little more until he received word of the date of delivery. Yankee would then have the materials unloaded at the designated job site.

When Yankee actually started work, it was allowed to send to Kewaunee an invoice for half the cost of its work. A contract form would then be sent by Kewaunee to Yankee to sign and return.[3] This arrangement prevailed until some time in the late 1970's when Kewaunee began pressing installers to bid.

Trudeau, Kewaunee's district sales manager from February 20, 1978, to October, 1980, was a supervisor of installation work in New England and could recommend to the main office whether installers for Kewaunee should continue to serve. Trudeau and Hyde were Kewaunee's only employees in the four States where Yankee did installations. Trudeau received a commission on the original placement

---

[3] A letter from Fred Jones of Kewaunee to Yankee dated August 19, 1966, described the installation agreement as "standard . . . on all our installation contracts and the purpose . . . is to provide us protection from any secondary boycotts on our jobs."

of an order by a customer for Kewaunee equipment, but received no commission on any installation subcontract.

On November 1, 1979, Hyde ceased to be employed by Kewaunee. Northeast Scientific Sales and Engineering, Inc. (Northeast), which had the capacity to do installations, then became a Kewaunee dealer for the four New England states previously dealt with by Hyde. David Johns was connected with Northeast. Trudeau knew Johns, because the latter's father's company had done installation work for Market Forge, a previous employer of Trudeau. It was not shown that Trudeau knew David Johns in any social way, or had other than a purely business relationship with him.

In December, 1979, Trudeau was instructed by a telephone call from Kewaunee's North Carolina headquarters to get in touch with William O'Neil, the superintendent of schools in Bedford, New Hampshire, about complaints by O'Neil concerning an installation there which had been made by Yankee. As Hyde was no longer employed by Kewaunee, Trudeau invited Johns to accompany him, partly so that the new dealer in the area could establish a good relationship with a customer and partly so that Johns could estimate corrective costs, if required. They were shown five areas of complaint by the school authorities. Trudeau testified that these would be items normally requiring correction after an installation, as to which it would be usual to call the original installer (in this case Yankee). Trudeau also testified that O'Neil told him that this list of items (apparently in the trade called "punch list items") had already been brought to Yankee's attention.[4]

Trudeau had only one face-to-face talk with Laurendeau, on September 6, 1979. The major subject of discussion then had been Yankee's failure to bid for installation work.

Following the trip to Bedford,[5] without further discussion with Laurendeau, Trudeau wrote a letter, dated December

---

[4] Hyde visited Bedford with Laurendeau in mid-January, 1980. He also described Yankee's defects as "punch list" items. He thought the work at Bedford "an excellent installation."

[5] The trip to Bedford was Trudeau's first opportunity to review Laurendeau's work. He did not know in December, 1979, how long Yankee had

20, 1979, to Richard Elder of Kewaunee listing Superintendent O'Neil's complaints. The letter concluded, "This is the third instance of customers registering complaints against Yankee. If at all possible, I would like to suggest we discontinue using Yankee on any future jobs. Specifically, we should reassign the installation of Kew[aunee] Order Nos. 5670 and 9365. Please let me know your comments." This letter was sent by Elder to Laurendeau for comments on January 11, 1980.

On January 9, 1980, Charles Phelps of Kewaunee sent a mailgram to Yankee to "disregard any shipping instructions . . . received on" Order No. 9365 (Walpole High School) and stating that "Northeast will be . . . installing Order 5670" (Massachusetts Maritime Academy). Laurendeau was told by telephone by Phelps and Elder that this was based on Trudeau's letter of December 20, 1979. There was no evidence that Trudeau in any way received profit from the transfer of contracts from Yankee to Northeast. On these two contracts as well as on two other contracts (see note 8, *infra*), Yankee had previously received "acknowledgement" papers. All four contracts were reassigned to Northeast by Kewaunee.

Yankee received no further work from Kewaunee, and was not asked for bids by Kewaunee. Yankee, however, was not shown after 1979 to have bid, or sought to make any bid, on any of Kewaunee's installation work. Trudeau and Fred Jones, an officer of Kewaunee, testified that Yankee remained on a list of Kewaunee installers and still could bid for work. This was the position taken very firmly by Jones in his letter of March 11, 1980, quoted in note 6, *infra*.

On February 4, 1980, Trudeau wrote to John Pendill[6] (of Kewaunee's North Carolina office) about the disputes be-

been doing work for Kewaunee or the quality of that work. He had made no inquiries about Yankee's record of workmanship. He had received one hearsay report of a complaint on one other installation.

[6] This letter of February 4 was in reply to a request for comments on a vehement letter dated January 18, 1980, from Hyde to Elder of Kewaunee. Jones, for Kewaunee, by a letter to Hyde dated March 11, 1980, declined

tween Kewaunee and Yankee. After referring to the refusal or inability of Laurendeau to "estimate a job from drawings," and to the Kewaunee policy about bids for installation work, Trudeau proceeded, "It seemed strange to me, realizing . . . [Laurendeau] could not estimate a job, that he continued to get work during 1979. In one instance . . . [Hyde] solicited and received bids for a project in Maine and . . . [Laurendeau] gave . . . [Hyde] a price $81.00 lower than the lowest installation price from an independent installer. How was . . . [Laurendeau] able to develop a price if he did not know the selling price and where did this information come from? This type of irregularity occurred on more than one occasion."

The circumstances outlined above provide one basis of the present action brought by Laurendeau and Yankee on May 5, 1980, against Kewaunee and Trudeau. The complaint, in general terms, alleged (pars. 1 to 8) those circumstances.[7]

Paragraphs 13 through 16 of the complaint alleged (1) that Trudeau (as employee of Kewaunee) made "knowing or negligent misrepresentations" about the plaintiffs' work to induce Kewaunee to stop doing business with them, (2) that Trudeau's statements were false and "interfered with

---

to transfer back to Yankee the reassigned orders nos. 5670 and 9365. He proceeded, however: "Ernie Laurendeau has always done a good job for Kewaunee . . . . We will continue to work with Ernie on future installations but he will have to learn to estimate prices from drawings and submit bids for the installation work . . . . [Trudeau] was correct in telling Ernie that he would be required to give competitive bids to Kewaunee in order to obtain future business; however, I think he was incorrect in reassigning two jobs that had been previously assigned to Ernie. With hindsight, his reasons for the reassignment are unsatisfactory to me. Ernie's long association and loyalty to Kewaunee far outweigh a few relatively minor gripes from a School Superintendent." Hyde showed Laurendeau this letter.

[7] Other matters also were set out in the complaint. Paragraph 9 alleged (a) a "fiduciary relationship" of Kewaunee to the plaintiffs and (b) a breach of G. L. c. 93A. See part 3 of this opinion. Under a heading, "Contract Claims," breaches by Kewaunee of four specific contracts were asserted in par. 11. See note 8, *infra*. In par. 12 various claims were asserted of money alleged to be due under specific past contracts, only two of which remained undisposed of at trial.

. . . [their] advantageous business relations with Kewaunee, and . . . caused Kewaunee . . . to . . . break existing contracts with [the] plaintiffs," (3) that Trudeau acted within the scope of his employment, and (4) that the plaintiffs' business relationship with Kewaunee had been damaged. Each defendant denied liability and each asserted as a special defense that Trudeau's statements were protected by privilege. The defendants offered no evidence. Kewaunee and Trudeau's motion for directed verdicts was allowed in part only.

The case was submitted to the jury on special questions. The jury (on questions relevant to pars. 13 through 16 of the complaint) answered in effect: (Answer 3) that Trudeau was "privileged with respect to all of his statements to . . . Kewaunee regarding . . . Yankee"; (Answer 4) that Trudeau abused his privilege; (Answer 5) that Trudeau wrongfully interfered with Yankee's business relationship with Kewaunee; (Answers 5a through 5e) that Trudeau's interference caused Kewaunee to refuse to deal with Yankee with respect to the jobs for four named institutions (see n.8) and "Yankee's position as installer in four New England states for Kewaunee";[8] (Answer 6) that Trudeau made "negligent or intentional misrepresentations to Kewaunee concerning Yankee or Laurendeau"; and (Answer 7) that Trudeau did not . . . defame Yankee or Laurendeau. The jury assessed against Trudeau $20,000 damages for interference with the four specific contracts and with Yankee's general relationship to Kewaunee (see Answer 5), and $50,000 based on

---

[8] The jury also found (Answer 2) that Kewaunee broke contracts with Yankee with respect to installations at Walpole High School, Arlington High School, and Southern Maine Vocational-Technical High School (with aggregate damages to Yankee to be paid by Kewaunee, of $13,248) but that Kewaunee committed no breach of contract with respect to an installation at Massachusetts Maritime Academy. Judgment was entered for Yankee against Kewaunee for $20,248, made up of the sum of $13,248 plus $7,000 found by the jury (in Answer 1b) to be owing to Yankee with respect to an installation at Dartmouth College. The trial judge was not required to grant judgment n.o.v. with respect to the $7,000 claim based on conflicting evidence.

Trudeau's alleged "negligent or intentional misrepresentations" concerning Yankee's work.

A motion by Kewaunee and Trudeau for judgment n.o.v. was denied on February 26, 1982, with respect to the "verdicts for monies owed on one contract and for breach of three executory contracts." See part 1 of this opinion, *infra*. The motion was allowed with respect to the verdicts against Trudeau for interference with advantageous relations and for misrepresentation.[9] From this order, each plaintiff and each defendant claimed appeals.[10]

1. There was some overlapping of (a) the claims for breach of three alleged subcontracts (as to which Yankee had been sent by Kewaunee "acknowledgement" papers) and (b) Yankee's tort claims that Trudeau wrongfully interfered with Yankee's contracts with Kewaunee as to those installations. To the extent that Kewaunee was found by the jury to be liable (see note 8, *supra*) for breach of these three subcontracts, Yankee (when and if paid) will have recovered

---

[9] The trial judge, as to the claim of "misrepresentation," ruled that Yankee and Laurendeau failed "to produce evidence on essential elements of the tort" asserted and did not show that they "acted in reliance on any misrepresentation made by" Trudeau to Kewaunee. The claims made in counts 13 and 14, based on Trudeau's two letters, however, do not appear to seek relief for deceit. Compare *Craig* v. *Everett M. Brooks Co.*, 351 Mass. 497, 499-501 (1967); *Anthony* v. *Vaughan*, 356 Mass. 673, 674-675 (1970). Instead those counts allege in effect only a single cause of action in tort, that is, wrongful interference with advantageous contractual relations. The Restatement (Second) of Torts (1977) describes as different, although somewhat related, the torts of defamation (§ 558), injurious falsehood (§ 623A), and interference with contractual or prospective contractual relations (§§ 766A, 766B, and 766C). The present evidence, however, seems directed only to different aspects of a single claimed wrong, rather than to multiple torts. See concerning the closely similar defenses (including that of privilege), the Restatement, §§ 594-596, 599, 603, 634, 646A, 650A, 767-768, and the discussion in *Sharratt* v. *Housing Innovations, Inc.*, 365 Mass. 141, 147-148 (1974). See also *Moran* v. *Dunphy*, 177 Mass. 485, 487 (1901).

[10] The scope of the plaintiffs' appeal was somewhat expanded by an order (November 5, 1982) of a single justice of this court allowing the plaintiffs to file a late appeal, "in order to avoid procedural entrapment and to put the entire case before the panel [of this court] on all issues." See note 16, *infra*.

essentially the profits which it would have made by performance if these contracts had not been reassigned to Northeast. See as to avoiding duplication of recoveries, Restatement (Second) of Torts, § 774A(2) and comment e (1979).

The evidence, concerning the usual arrangements between Yankee and Kewaunee prior to 1979, permitted the jury to find that Yankee, by practice, had made essentially a continuing offer to Kewaunee to perform whatever installations were requested by "acknowledgements" sent to Yankee. The judge's charge to this effect was proper. See *Simons* v. *American Dry Ginger Ale Co., Inc.*, 335 Mass. 521, 525 (1957); Restatement (Second) of Contracts, §§ 1 comment f, 25 (1981); 1 Corbin, Contracts, §§ 42-44, 53, 96 & n.15.10 (1963). Compare *Gill* v. *Richmond Coop. Assn., Inc.*, 309 Mass. 73, 79-80 (1941).[11] Kewaunee's appeal from the judgment for damages for breach of the three contracts thus fails.

The jury found that Kewaunee was not liable to Yankee and Laurendeau for breach of the contract with Massachusetts Maritime Academy. Although that contract (on which Yankee had received "acknowledgement" papers) was reassigned to Northeast, on the jury's finding that there was no breach of contract by Kewaunee, there is no basis for concluding that action by Trudeau inducing the reassignment wrongfully caused financial loss to either plaintiff.

2. The trial judge's order allowing the motion for judgment n.o.v. set aside the jury's findings (a) of $20,000 damages against Trudeau for interference with the four named installation contracts, see note 8, *supra*, as well as with "Yankee's position as installer in four New England states for Kewaunee," and (b) the award of $50,000 for damages based on Trudeau's alleged "negligent or intentional misrepresentations to Kewaunee concerning . . . Yankee . . . or

---

[11] On this theory, Yankee's offer (if found to exist) could have been withdrawn by Yankee at any time prior to its acceptance, at least on reasonable notice. See discussion in *Loranger Constr. Corp.* v. *E.F. Hauserman Co.*, 376 Mass. 757, 762 (1978). The evidence does not indicate that Kewaunee, on this theory, came under any obligation to accept Yankee's offer (by sending to Yankee acknowledgement papers) as to any specific proposed installation. See note 14, *infra.*

Laurendeau's work." We conclude that the judge's order was correct.

Recent Massachusetts cases (reviewing earlier authorities) establish that, to permit recovery for malicious interference with advantageous contractual relations, there must be an unprivileged interference with contractual rights. See *Steranko* v. *Inforex, Inc.*, 5 Mass. App. Ct. 253, 272-273 (1977).[12] Interference with advantageous relations reasonably likely to continue and to ripen into future contracts may also give rise to such recovery.

*Gram* v. *Liberty Mut. Ins. Co.*, 384 Mass. 659 (1981), dealt (at 663-665) with an allegedly tortious interference (by intermediate level supervisors of a large company) with the plaintiff's employment contract. The majority opinion,[13] citing the *Steranko* case, held that the evidence there presented did not warrant a verdict for the plaintiff against the intermediate supervisors on a complaint "that each inten-

---

[12] In the *Steranko* case, it was said, "If . . . interference [with a contractual right by a party not privy to the contract] is . . . intentional and without justification, it is malicious in law even though it arose from good motives and without express malice . . . . A defendant may escape liability if the interference was privileged as part of his employment responsibilities . . . . This rule has particular force as applied to corporate officers, since their freedom of action directed toward corporate purposes should not be curtailed by fear of personal liability." The opinion indicates (at 273) that a corporate officer enjoys "a qualified privilege . . . subject . . . to defeasance if his conduct emanated from actual malevolence or malice."

[13] The *Gram* opinion indicated (at 664) that "[a]ny reasonable inference of malice" must be "based on probabilities rather than possibilities," citing *Alholm* v. *Wareham*, 371 Mass. 621, 627 (1976), as shown by the evidence, considered "collectively" (at 665). The court mentioned the circumstance that the defendant supervisors "did not act on their own" but "subjected their conclusion for consideration by their superiors." Compare the present case where Trudeau did not act himself but only submitted recommendations to superiors. The court assumed that the supervisors did not want the plaintiff to work under them, that they did not conduct an adequate investigation of the circumstances asserted as a ground for discharge, and that no good reason justified the discharge. Nevertheless, it was held (at 665) that "an inference of an intent to obtain [the plaintiff's] discharge out of ill will toward him is no more probable" than the inference that the supervisors acted upon "a sincerely held but erroneous view . . . [about] company policy."

tionally interfered with . . . [the plaintiff's] contractual rights." Because the supervisors were "acting within the scope of their employment responsibilities," each had a privilege of the type referred to in the *Steranko* case. See n.12, *supra*.

The record did not justify the jury in finding that Trudeau abused his employee's privilege. He was bound to report matters coming to his attention bearing upon whether installers should continue in their work. For the recommendations which Trudeau did make, there was no evidence that Trudeau received financial advantage or that Trudeau had any special social friendship with, or interest in, Johns (other than that the latter's company, Northeast, had become a Kewaunee dealer). There was no proof of the extent of any inaccuracy in Trudeau's report of complaints about Yankee's work, nor did Trudeau show, in his one contact with Laurendeau, ill will apparent to the latter. The trial judge correctly regarded the situation as controlled by the *Gram* case, at 664-665. The evidence collectively, where the jury had found that Trudeau had a privilege, did not warrant an inference "based on probabilities rather than possibilities" that Trudeau's recommendations were tainted by malice, "motivated by spite," or even by lack of justification or good faith. See *Chemawa Country Golf, Inc.* v. *Wnuk*, 9 Mass. App. Ct. 506, 509-512 (1980). Compare *Malloy* v. *Coldwater Seafood Corp.*, 338 Mass. 554, 561-565 (1959). Compare also *Owen* v. *Williams*, 322 Mass. 356, 360-362 (1948); *Ezekiel* v. *Jones Motor Co., Inc.*, 374 Mass. 382, 390-392 (1978); *Ryan, Elliott & Co. Inc.* v. *Leggat, McCall & Werner, Inc.*, 8 Mass. App. Ct. 686, 688-693 (1979).

The evidence[14] (see part 1 of this opinion) did not permit the jury to conclude that Kewaunee was under any express

---

[14] Laurendeau knew at least from 1978 on that Kewaunee wanted Yankee to bid for Kewaunee subcontracts. Kewaunee had notified Yankee on August 29, 1979 (long before Trudeau's two letters), that Kewaunee was reassigning the Arlington High School subcontract because Yankee "did not submit a bid on this work." Laurendeau had been told in 1964 that future dealers might "decide to install their own jobs," that Kewaunee did not promise that Yankee "would be the only company installing in the

or implied obligation to give to Yankee subcontract installation work on projects on which it had not given Yankee "acknowledgements." The record also does not show that in December, 1979, there was any existing contract between Kewaunee and Yankee (other than the three contracts for the breach of which Yankee is to recover) or that any relationship existed between Kewaunee and Yankee which was reasonably likely, apart from conjecture, to lead to profitable subcontracts for Yankee. This was certainly so unless Yankee became willing to bid for the work.[15] It also was not established that Kewaunee ever removed Yankee from its list of installation subcontractors or that it was not prepared to have further relations with Yankee if Yankee would bid for subcontracts.

3. The trial judge directed a verdict for Kewaunee on par. 9 of the complaint which averred in general terms that Kewaunee was liable under an oral contract with Yankee, that Kewaunee had a fiduciary relationship to the plaintiffs, and that Kewaunee had violated G. L. c. 93A in dealing with the plaintiffs. The evidence showed no basis for finding an oral contract or that Kewaunee was in any sense a fiduciary. We perceive no respect in which either defendant engaged (see G. L. c. 93A, § 11) in conduct either "(1) . . . within at least the penumbra of some . . . established concept of unfairness"; or (2) in itself "immoral, unethical, oppressive, or unscrupulous." See *PMP Associates, Inc.* v. *Globe Newspaper Co.*, 366 Mass. 593, 596 (1975), quoting from *Federal Trade Commn.* v. *Sperry & Hutchinson Co.*, 405 U.S. 233, 244 n.5 (1972); *Levings* v. *Forbes & Wallace,*

New England area," and that Kewaunee retained "the right to delegate jobs to others." Laurendeau testified also that Kewaunee never told him of any surrender of that right.

[15] See for cases dealing with somewhat analogous business arrangements terminable at the will of either party, *Maddaloni* v. *Western Mass. Bus Lines, Inc.*, 386 Mass. 877, 884 (1982); *Kravetz* v. *Merchants Distrib., Inc.*, 387 Mass. 457, 461-463 (1982). See also *Zapatha* v. *Dairy Mart, Inc.*, 381 Mass. 284, 288-300 (1980). Compare *Comey* v. *Hill*, 387 Mass. 11, 19-20 (1982); *Siles* v. *Travenol Labs., Inc.*, 13 Mass. App. Ct. 354, 358-359 (1982).

*Inc.*, 8 Mass. App. Ct. 498, 503-504 (1979); *Zapatha* v. *Dairy Mart, Inc.*, 381 Mass. 284, 299-300 (1980). See also the situation considered in *Cort* v. *Bristol-Myers Co.*, 385 Mass. 300, 304-306 (1982).

4. Yankee contended that it was entitled to recover that portion of a disputed amount, about $17,000, not paid to it by Kewaunee for installing furniture at the University of Massachusetts. Laurendeau conferred about this balance with Kewaunee's representatives at the company's North Carolina office. After the conference, Kewaunee sent Yankee a check for $7,426.61 stating it to be "our final payment . . . for this order." Laurendeau noted on the remittance voucher "Pd. towards billing of $17,054.50." The trial judge instructed appropriately on the issue of accord and satisfaction, in a manner consistent with *Worcester Color Co.* v. *Henry Wood's Sons*, 209 Mass. 105, 108-110 (1911). See *Goes* v. *Feldman*, 8 Mass. App. Ct. 84, 91-92 (1979). See also Restatement (Second) of Contracts § 281 (1981). The matter was reasonably disposed of by the jury under proper instructions.[16]

*Judgment affirmed.*

---

[16] The issues discussed in parts 3 and 4 of this opinion, so far as presented pursuant to the order of a single justice of this court allowing Yankee and Laurendeau to prosecute a late appeal, have been decided in Kewaunee's favor. There is thus no occasion to consider the propriety of the order of the single justice, objected to by Kewaunee.