TSC INDUSTRIES, INC.,
Plaintiff–Appellant,

v.

J. Michael TOMLIN, et al.,
Defendants–Appellees.

Court of Appeals of Tennessee,
Western Section, at Nashville.

Aug. 5, 1987.

Permission to Appeal Denied by
Supreme Court Dec. 21, 1987.

Gerald A. Smith and W. Gary Blackburn, Barnett & Alagia, Nashville, for plaintiff-appellant.

Ward DeWitt, Jr. and Dan Elrod, Trabue, Sturdivant & Dewitt and Peter Curry and Charles McElroy, Boult, Cummings, Conners & Berry, Nashville, for defendants/appellees.

HIGHERS, Judge.

This is an appeal from a directed verdict in favor of the defendant, First American Bank of Nashville.

The litigation arose out of the sale by the plaintiff, TSC Industries, Inc. (TSC), of the building in which its offices were located. In May 1984, TSC filed suit against J. Michael Tomlin, the purchaser of the property, alleging fraud and breach of contract, and seeking rescission of the sale or compensatory and punitive damages. In June of 1985, TSC filed suit against First American Bank of Nashville (FAB), alleging that it: (1) induced Tomlin to breach his sales contracts; (2) conspired with others to induce Tomlin to breach the contracts; (3) conspired with Tomlin and others to breach the contracts; and (4) conspired with Tomlin and others fraudulently to induce TSC to enter into a contract. TSC also sought both compensatory and punitive damages from FAB. The cases were consolidated for trial.

Trial before a jury began on August 11, 1986. At the close of plaintiff's proof, both Tomlin and FAB moved for a directed verdict. Following oral argument, the trial court directed a verdict in favor of FAB and dismissed the action against it. That verdict alone is the subject of this appeal.

The trial continued with Tomlin as the sole defendant. After his direct testimony, but prior to cross-examination, the parties entered into a compromise and settlement in which Tomlin agreed to pay TSC $600,-000.

In 1982 TSC learned that its parent corporation, Fuqua Industries, was planning to sell the company. In anticipation of that sale, TSC decided to sell its headquarters, a

70,000 square foot building located at 915 Murfreesboro Road in Nashville (the "Trac–Tenn Building"). The property had been financed by industrial revenue bonds, and TSC management felt that an immediate sale of the building and retirement of the bonds would facilitate the sale of the company. To that end, TSC entered into negotiations with Tomlin.

A proposed purchase agreement was drawn up in which Tomlin would purchase the building for $2,175,000 and lease a portion of it back to TSC. The additional space would be leased to the State of Tennessee. TSC considered the proposal, then arranged a meeting with Tomlin.

At that meeting Thomas J. Hennesy, then a vice-president of Fuqua Industries, expressed concern about the purchase price, as TSC was seeking at least $2,700,-000 for the property. Tomlin explained that in lieu of the full price he was offering a series of rent rebates, based on the interest rate at which he obtained financing. Hennesy then stated that TSC would prefer to receive additional cash, so Tomlin mathematically converted the proposed rent rebates into cash payments. The figures were acceptable to Hennesy, and on August 20, 1982, a Real Estate Purchase Agreement was executed. Closing was set for no later than January 15, 1983.

The relevant provision of the Agreement, paragraph nine (9), reads as follows:

> In the event that the Purchaser receives 100% financing for its purchase of the Property at an interest rate of 15% or less, Seller shall have the option of paying the first year's annual rental at the applicable rate set forth below under column (a) or receiving from Purchaser the applicable cash payment set forth below column (b):

| Interest Rate of Purchaser's Loan | (a) Rent Per Square Foot Per Year | (b) Cash Payment |
|---|---|---|
| 14.01–15% | $6.34 | $250,000 |
| 13.01–14% | $5.70 | $400,000 |
| 12.01–13% | $5.05 | $600,000 |

TSC alleges that Tomlin made representations that he would obtain the lowest interest rate possible.

The parties expected Tomlin to obtain long-term financing through either industrial revenue bonds or conventional financing. On November 29, 1982, Tomlin obtained approval from FAB for a short-term loan (thirteen months) in order to acquire the property; the interest rate was 15¼%. He told TSC that he would obtain permanent financing after the closing, which he requested be done at the earliest possible date. However, as the 15¼% interest rate did not entitle TSC to a cash payment under the Agreement, Hennesy was unwilling to accelerate the closing unless Tomlin agreed to extend the entitlement to any subsequent financing. Therefore, by letter dated December 7, 1982, TSC and Tomlin entered into an agreement (the "Extension") providing that:

> It is the intent and purpose of this letter to evidence the agreement of the parties that in lieu of ... [¶ 9] ..., and in satisfaction and modification of the said Real Estate Purchase Agreement, we agree that in the event, and only in the event the undersigned obtains refinancing for his purchase of the property within one (1) year from the date hereof, at an interest rate of 15% or less, and upon other terms acceptable to J. Michael Tomlin, TSC Industries, Inc. shall receive from the undersigned the applicable cash payment set forth under Column (b).... It is represented hereby that M. Michael Tomlin's initial financing of the real property is at such rate and upon such terms as not to entitle TSC Industries, Inc. to any cash payment or reduction in rental payment at this time. Nevertheless, J. Michael Tomlin agrees to use his best efforts within the one (1) year period to obtain industrial development bond financing for the property.

The sale was closed on December 6, 1982. Tomlin did not obtain refinancing within one year of the Extension, and TSC's entitlement to any cash payment expired. Subsequently, FAB renewed the loan for an additional short term at an interest rate of 12.9%.

Before reaching the question of the propriety of the directed verdict, we must first

dispose of an issue raised by the appellee, FAB.

Relying upon *Swift v. Beaty*, 39 Tenn. App. 292, 282 S.W.2d 655 (1954), FAB argues that Tennessee law provides that when an injured party to a contract settles with the alleged breaching party, the settlement operates as a discharge of any claim the injured party might have against a third person for inducing the alleged breach. Thus, TSC's settlement with Tomlin should bar the action against FAB.

■ We believe that this is an inaccurate interpretation of the holding in *Swift*. In that case the plaintiff, after the alleged breach, deliberately executed a written cancellation of the contract without reserving his right of action. The Court held that the rule of *Watts v. Warner*, 151 Tenn. 421, 269 S.W. 913 (1925), was controlling. In *Watts*, the Supreme Court stated:

> So this bill ... rests on the proposition that there was a contract between Mrs. Warner and the complainant.... Chapter 154 of the Acts of 1907 [T.C.A. § 47–50–109], upon which the suit ... is founded, denounces interference with 'any lawful contract'....
>
> When, therefore, Mrs. Warner ... avoided the alleged contract, the whole basis of the complainant's suit ... was swept away. No judgment could be based against a defendant for interference with an unenforceable repudiated contract.

269 S.W. at 914.

The holding in *Swift* is therefore based on the proposition that the plaintiff had no legal right to enforce the contract, and thus could not maintain an action against a third party for inducing its breach. In the case before us, nothing impaired TSC's right to enforce its contract with Tomlin. As stated in *Swift*, 282 S.W.2d at 659, a person's liability in tort for inducing the breach of a contract is separate and distinct from the injured party's right of recovery in contract against the breaching party. Thus, the mere fact that a compromise and settlement has been reached with regard to the contract action does not bar

an action for inducement of that contract against a third person.

■ Although one who induces a breach of contract is also liable for consequential losses, and emotional distress or harm to reputation, the damages recoverable for the pecuniary loss of the contract are common to both the action for breach and the action for inducement. Therefore, since where there is only one injury the law permits only one recovery, any payments made by the one who breaches the contract must be credited in favor of the one who induced the breach. *See* Restatement (2d) of Torts § 774A, and comment (e) (1979). *See also, Kassman v. American University*, 546 F.2d 1029, 1033–4 (D.C.Cir.1976); *Reliable Tire Distributors Inc. v. Kelly Springfield Tire Co.*, 607 F.Supp. 361, 373 (D.C.Pa.1985); *Laurendeau v. Kewaunee Scientific Equipment Corp.*, 17 Mass.App. 113, 456 N.E.2d 767, 772 (1983); *Ross v. Holton*, 640 S.W.2d 166, 173 (Mo.App.1982).

TSC has asserted several theories of liability against FAB. These theories, however, are not separate and distinct, they require virtually the same elements of proof. The gravamen of the complaint is that FAB, with knowledge of the existence of the contract, its terms, and the representations Tomlin made to TSC, intentionally assisted and induced Tomlin to breach the Agreement and the Extension.

The rule is well established in this State that upon defendant's motion for a directed verdict, the Court must take the strongest legitimate view of the evidence in favor of the plaintiff, allow all reasonable inferences in plaintiff's favor, and discard all countervailing evidence. The motion must be denied unless there is no material evidence in the record that would support a verdict for the plaintiff. *See, e.g., Gann v. International Harvester Co. of Canada, Ltd.*, 712 S.W.2d 100, 105 (Tenn.1986). In the case before us, the trial judge was satisfied that TSC had introduced no material evidence that would support a finding of liability against FAB. After an extensive review of the record, we are of the opinion that his grant of a directed verdict was correct.

■ Under Tennessee law, there are seven elements to an action for inducement to breach a contract, both at common law and under T.C.A. § 47–50–109. These elements are also necessary to establish a cause of action for conspiracy to induce a breach of contract. The plaintiff must prove: (1) that there was a legal contract; (2) that the wrongdoer had sufficient knowledge of the contract; (3) that the wrongdoer intended to induce its breach; (4) that the wrongdoer acted maliciously; (5) that the contract was breached; (6) that the act complained of was the proximate cause of the breach; and (7) that damages resulted from the breach. *See, e.g., Continental Motel Brokers, Inc. v. Blankenship,* 739 F.2d 226 (6th Cir.1984); *Edwards v. Travelers Insurance of Hartford, Conn.,* 563 F.2d 105 (6th Cir.1977); *Koehler v. Cummings,* 380 F.Supp. 1294 (M.D.Tenn.1971); *Hart v. First National Bank of Memphis,* 690 S.W.2d 536 (Tenn.App.1985); *Dynamic Motel Management, Inc. v. Erwin,* 528 S.W. 2d 819 (Tenn.App.1975).

The trial court held that TSC failed to show that FAB had sufficient knowledge of the contract to support a finding of intent to induce its breach.

■ TSC is contending that Tomlin had a contractual duty to obtain the lowest possible interest rate on his financing of the Trac–Tenn Building, and that FAB successfully induced him to breach that duty. TSC therefore was required to show that FAB knew Tomlin had such a duty. Absent knowledge of the duty, there could have been no intention to induce its breach. *See Dynamic Motel Management,* supra, 528 S.W.2d at 823.

The factual allegations contained in the plaintiff's complaint, and the evidence introduced at trial in support thereof establish only that Tomlin made representations to TSC that he would seek the lowest possible interest rate. Neither the Agreement nor the Extension contained a provision obligating Tomlin to obtain the lowest possible rate of interest. The Agreement provided that "in the event" Tomlin obtained financing at 15% or below, TSC would become entitled to a cash payment. The Ex-

tension provided only that "Tomlin agrees to use his best efforts ... to obtain industrial development bond financing for the property." Thus even if FAB representatives had read the contracts word for word, they would not have learned of a duty such as TSC maintains existed. There is no evidence in the record, however, that FAB ever saw the contract.

■ TSC argues that even if the duty to obtain the lowest interest rate available was not expressly provided for, FAB may be held liable because the law implies in every contract a duty of good faith and fair dealing. It is true that there is implied in every contract a duty of good faith and fair dealing in its performance and enforcement, and a person is presumed to know the law. *See* Restatement (2d) Contracts, § 205 (1979). What this duty consists of, however, depends upon the individual contract in each case. In construing contracts, courts look to the language of the instrument and to the intention of the parties, and impose a construction which is fair and reasonable. *See, e.g., Covington v. Robinson,* 723 S.W.2d 643, 645–6 (Tenn.App. 1986).

Although it is undisputed that the Bank knew a contract between TSC and Tomlin existed, the evidence is uncontradicted that the Bank's only information as to the terms of that contract came from Tomlin himself. The record establishes that Tomlin told the Bank only that the purchase price of the building increased as the interest rate decreased. There is no evidence that the Bank was told of the representations Tomlin made to TSC concerning his willingness to seek a low rate of interest.

FAB might be presumed to know that every contract contains a duty of good faith and fair dealing. Clearly, however, as the Bank had never seen the contracts, did not know the actual contract terms, did not know the intention of the contracting parties, and was unaware of Tomlin's representations to TSC, it could not have known what Tomlin's duty of good faith required him to do.

TSC has failed to introduce any material evidence that FAB had any knowledge of

Tomlin's duty to obtain the lowest interest rate possible; therefore, a judgment against FAB would have been unsupportable, and the directed verdict was proper. The judgment of the trial court is affirmed. Costs of the appeal are taxed to the appellant.

CRAWFORD and CANTRELL, JJ., concur.