Fabricant, J.
INTRODUCTION
This case presents a dispute regarding compensation claimed to be due from the plaintiff to the corporate defendant under a contract for the provision of “advisory services” in connection with the plaintiffs effort to raise capital for clinical trials of its pharmaceutical product. Presently before the Court is the plaintiffs motion for partial summary judgment on its declaratory judgment claim, and on the defendants’ counterclaims.[1] In substance the plaintiff seeks a ruling that it owes the corporate defendant no compensation.
BACKGROUND
The evidence offered in connection with the present motion, considered in the light most favorable to Kenmare, provides the following facts. The plaintiff, Noveios Therapeutics, has described itself as “a late stage pharmaceutical development company that plans to patent, license, manufacture, market, and sell new, proprietary, high value-added drugs for cancer and other life-threatening diseases in North America, Europe, and Japan.” As of August of 1998, *390 Novellos was seeking capital to fund clinical trials of its first drug, which it described as “a chemically synthesized, biologically active compound . . . expected to capture a significant share of the . . . market for immune system modulators . . . and blood cell disorder drugs.” The clinical trials it planned at that time involved “patients with cancer undergoing chemotherapy and suffering from neutropenia, thrombocytopenia, and anemia, and patients with myelodysplastic syndromes.” In particular, Novelos sought to conduct clinical trials using its technology “for treatment of blood disorders known as cytopenias.”
The defendant Kenmare Capital Partners, Ltd., describes its business on its letterhead as "investment banking and technology assessment for biosciences.” Its promotional brochure elaborates: “Our services are strategically focused at raising public and private capital for our clients and maximizing shareholder value.” The brochure goes on to boast that Kenmare “has well established long-term business relationships with underwriters of emerging companies and institutions investing private capital.” The brochure identifies Kenmare’s principals as defendant Dennis N. Caulfield, “responsible for investment banking,” and Virginia Rybski, “responsible for technology assessment.” Neither Kenmare nor its principals are, or were at any relevant time, registered as broker-dealers or agents under the Massachusetts Securities Law, G.L.c. 110A.[2]
Novellos and Kenmare entered into the agreement that gives rise to this dispute on August 21, 1998. The parties agree that Caulfield drafted the agreement, although Kenmare offers evidence that Novellos’s counsel reviewed the draft and recommended changes, which the parties incorporated. The agreement, in the form of a letter on Kenmare’s letterhead, identifies Novellos as “the Company” and Kenmare as “the Advisor.” It recites its purpose, in an unnumbered introductory paragraph, as follows:
This letter sets forth the basic terms of the agreement whereby Kenmare Capital Partners, Ltd. will act as exclusive advisor to the Company for the Private Offering of its Securities or negotiating an alternative transaction as defined in Paragraph (9).
Fourteen numbered paragraphs follow, providing details of the contemplated transaction and of the compensation to be due Kenmare under various scenarios. Paragraph 1 provides:
1. AMOUNT: Aprivate offering ofup to $37,000,000 consisting of 12,119 shares of Common Stock and terms described in the Term Sheet (“the Securities”) (Exhibit A).
Paragraph 2, captioned “ESCROW ACCOUNT,” provides that “The private Offering will be in three stages, ” with the first five million dollars for “pre-clinical testing,” the next ten million for “Complete European Clinical testing and begin Phase 2 U.S. Clinical testing,” and the remaining twenty-two million for "Complete phase 2 U.S. Clinical Testing and begin phase 3 U.S. Clinical Testing.” Paragraph 3, labeled “CLOSINGS,” provides that “The first closing shall occur no later than one-hundred-twenty (120) days from the ‘offering’ Date for the first stage (I),” with the second and third to follow, each thirty days after the offering date for that stage. As to the latter two stages, however, “if any investor does not exercise any rights to purchase . . . the Advisor shall have ninety (90) days from the closing date to place any such securities.”
Paragraph 4, captioned “OFFERING DATE,” supplies the triggering date for the closing deadline set in paragraph 3, providing that the parties agree “to use their best efforts” to complete all necessary documents by September 15, 1998, and that “The date all documentation is completed shall be the Offering Date.” The number of shares to be outstanding as of the Offering Date appears in paragraph 5, under “CAPITALIZATION.” In paragraph 8, “BUSINESS PLAN,” the parties agree “to use their best efforts” to prepare a five-year business plan and estimates of sales and earnings by September 15, 1998. Paragraph 8 goes on to provide that “The Company will also provide any information necessary for the Advisor to answer due diligence questions from prospective investors in the Private Offering.” Paragraph 11, “FINANCIAL INFORMATION,” specifies certain financial information that “the Company will provide Private Offering investors,” unless “the Company is subject to the reporting requirements of the Securities and Exchange Act of 1934,” in which case “this paragraph (11) will not apply.” Under paragraph 13, regarding “REGISTRATION RIGHTS,” the company will file a registration statement upon demand of a majority of the “holders of Private Offering Securities.” Paragraph 12, “TERM SHEET,” incorporates the term sheet attached, with “The final term sheet [to] be mutually agreed to after the Advisor has received the - Company’s business plan.” It provides, however, that “the Advisor is authorized to immediately begin the Private Offering on the terms” as attached. Paragraph 7, “EXPENSES,” provides that each party shall bear its own “expenses of the Private Offering,” and that “The Company’s ‘Blue Sky’ applications shall be made in such states and jurisdictions as shall be requested by the Advisor and agreed to by the Company.”
Paragraphs 6, 9, 10, and 14 address Kenmare’s compensation. Paragraph 6, “ADVISOR’S COMPENSATION FOR PRIVATE OFFERING,” provides for a commission on a formula based on specified percentages “of the gross offering price of the Securities,” with payment “at the closing for each stage," along with issuance at that same time of warrants on specified terms.
Paragraph 9, labeled “ADVISOR’S COMPENSATION FOR ALTERNATIVE TRANSACTION,” provides in its entirety:
*391 In the event of the sale, merger or joint venture of the Company or the sale or licensing of any significant assets of the Company or the financing of research and development and/or clinical evaluation programs, as an alternative to the Private Offering (“the Alternative Transaction”); then, the Company shall pay the Advisor, in the legal consideration for the Alternative Transaction, whatever the form of the consideration, the following: (a) the Private Offering compensation as specified in paragraph 6(a) and 6(b) on the first $37,000,000, (b) two percent (2%) of the remainder, and (c) the Company shall receive ninety-four percent (94%) and the Advisor six percent (6%) of any licensing royalties.
Paragraph 10, captioned “ADVISOR’S COMPENSATION AFTER CLOSING,” provides a formula for compensation to Kenmare in the event that “the Advisor is not the exclusive Advisor for any subsequent offering or transaction and if investors in the .Private Offering or Offerees . . . that do not invest in the Private Offering, purchase any private offering securities, or any public offering securities which are not underwritten, directly from the Company or from an agent for the Company.” Paragraph 10 goes on to provide, however, that “these provisions shall expire three (3) years from the closing of the last stage and the Company will have no obligation to pay the Advisor compensation for any investments or Alternative Transactions after the three (3) year expiration date.”
Finally, paragraph fourteen provides two “SPECIAL ■ PROVISIONS REGARDING ADVISOR’S COMPENSATION,” which it describes as "exceptions” to the “Exclusive Advisor provisions of the agreement.” The first of these, 14(a), provides;
If the Company is responsible for placing any part of the $37,000,000 Private Offering or an Alternative Transaction, the Advisor’s Compensation shall be reduced by fifty percent (50%) for any compensation that would otherwise be due to the Advisor without this exception.
Paragraph 14(b) provides for reduced compensation in the event that “the Company is successful in concluding its present negotiations with an investor interested in investing the $37,000,000 as an alternative to the Private Offering or in concluding its present negotiations for self-funding through sales to an affiliate, and either of those events occur before the Advisor closes stage I of the Private Offering.”
Appended to the agreement was a “Term Sheet,” setting out proposed terms of the private offering. The term sheet specified the gross proceeds of the offering as $37,000,000, the closing date as “On or before January 15, 1998,”[3] and provided certain terms of the offering. The term sheet identified Kenmare as “Exclusive Advisor,” specified “Advisory Fees” according to the formula in the agreement, and provided that “Advisory fees will be paid and warrants issued at each closing.”
Kenmare proceeded to prepare first an executive summary, and then the private offering memorandum. The latter document, dated March 1, 1999, includes, under the caption “Confidential and Proprietary,” the recipient’s undertaking that the information provided “are not to be used for any purpose other than in connection with the recipient’s consideration of the purchase of the Common Stock ...” The memorandum goes on to recite that Kenmare "is furnishing” it “solely for the consideration of institutional and other accredited investors who have the knowledge and experience in financial and business matters and the capability to conduct their own due diligence investigation and evaluation in connection with the investment,” and that “the Securities offered in this Memorandum are being sold as a private offering . . . and accordingly, are not being registered under the Securities Act. . . The Securities described herein are being offered to a limited number of institutional and other accredited investors . . . Neither this Memorandum nor its delivery to any prospective investor shall constitute an offer to sell or the solicitation of any offer to buy the Company or its Securities.” The memorandum indicated that all inquiries should be directed to Kenmare. Also included in the memorandum was a revised term sheet, similar to the previous one, but showing gross proceeds of $30,000,000, with a closing date of “On or before March 1, 1999.”
According to Kenmare’s interrogatory answer, “(t]he Executive Summary was completed bn or about September 11, 1998, and sent to several pharmaceutical companies . . . During the period September 11, 1998 to January 1999 Kenmare received responses from the pharmaceutical companies ... indicating no interest.” The Private Offering Memorandum, according to Kenmare’s answers to interrogatories, “was intended to be a marketing document to solicit interest... from the pharmaceutical companies for an Alternative Transaction and secondarily for professional venture capital investors and to be used as a document for Novelos to solicit individual private investors.” Caulfield’s affidavit elaborates, asserting that Kenmare prepared the private offering memorandum “intending it to be used more as a marketing document to solicit interest in the Novelos technology from pharmaceutical companies in regard to Alternative Transactions than in an attempt to solicit private equity investors.” This approach, according to Caulfield’s affidavit, was because Caulfield believed “that the $37,000,000 cost of clinical trials based on the cytopenia strategy made the private placement of equity securities unrealistic.”
In February of 1999, Caulfield sent copies of the memorandum, with cover letters, to potential investors.[4] The cover letters asserted, variously, that Novelos “is going to be a blockbuster and its initial investors are going to enjoy real increase(s) in wealth,” “(w]e believe that this is an extraordinary opportunity *392 to benefit society and create wealth,” “(o]ur objective is to complete the deal either publicly or privately as quickly as possible,” “I believe you will find this to be a very exciting investment opportunity,” and that “(d]ue diligence files are available for review.” The responses received were uniformly negative, confirming Caulfield’s view, according to his affidavit, that “the marketing strategy based upon the use of the Novelos technology for treatment of blood disorders was not a viable strategy. For that reason, both parties allowed the original January 15, 1999 so-called ‘deadline’ for the first stage of a private placement to pass notwithstanding the fact that no equity securities had been placed. During January, February, March and April of 1999 the parties continued to work together under the frame work of the August 21, 1998 Agreement towards the end of effectuating Alternative Transactions for the benefit of Novelos.”
According to Kenmare’s answers to interrogatories, “between September 1999[5] and July 1999 Kenmare sent about 219 Confidential Offering Memorandums (sic) to pharmaceutical companies and venture capital investment organizations and Novelos sent about 74 Confidential Offering Memorandums (sic) to individuals and others for investment and public relations purposes. Except for the individual investors that Novelos solicited and who invested in Novelos the response from the other solicitations . . . was not interested ... In summary, the Executive Summary and Confidential Private Placement Memorandum test market program proved between September 1998 and July 1999 that the Novelos . . . cytopenia clinical development strategy was a big loser.”
Kenmare’s interrogatory answer goes on to recite that on or about March 31, 1999, over Novelos’s objection, it published[6] its own review of certain information it had received from Novelos, expressing the conclusion that “the data clearly establishes that the United States clinical studies should include non-small cell lung cancer and small cell lung cancer with survival as an endpoint.” Such studies, Kenmare asserts, “would be a fraction of the cost of the cytopenia indication.” Kenmare prepared documents based on its newly proposed approach, and submitted those documents to a potential investor known as The Medicines Company. Novelos adopted the new strategy, and The Medicines Company “used their proprietary software to design a clinical development program” at a cost of between two and three million dollars. Thus, according to Kenmare, “Novelos received and accepted the intellectual capital of Kenmare and The Medicines Company which intellectual capital identified the non-small cell lung cancer indication and created the design of the Novelos clinical development program.” According to Kenmare’s interrogatory answer, Kenmare’s work thus “created real capital for Novelos and Novelos received a benefit of about $37 million (cost of cytopenia clinical development program) less about $3 million (cost of the new Novelos clinical development program).”
Thereafter, however, in April 1999, according to Kenmare’s interrogatory answer, Novelos informed Kenmare that "Kenmare could present the non-small cell lung cancer business plan clinical development program to pharmaceutical companies and venture capital investors but Novelos planned to continue with the cytopenia indication.” Simyon Palmin stated, according to Kenmare’s interrogatory answer, that “The Medicines Company is not going to run Novelo’s business and non-small lung cancer is a Kenmare strategy not a Novelos strategy.” Despite this position, according to Kenmare, Novelos did adopt the non-small cell lung cancer strategy, incorporating it into a “Proposed Development Plan” dated May 27, 1999, and into a filing with the Food and Drug Administration in August 1999.
In July 1999, according to Kenmare’s interrogatory answer, "Novelos and Newcastle Pharmaceuticals entered into an agreement for the purchase of the exclusive cancer rights to the Novelos drug BAM-002 for $36.4 million . . . The private placement and Alternative Investment strategy was pursued by Newcastle to obtain funding for Novelos until the contract terminated on March 31, 2000.”[7]
. According to Caulfield’s affidavit, in late August of 1999, Simyon Palmin told Caulfield “that he wanted to ‘rewrite’ the August 12, 1998 Agreement to reflect the developments of the preceding year, meaning to me, that he still considered the Agreement to be operative.” On November 23, 1999, according to Caulfield’s affidavit, Harry Palmin, president of Novelos, faxed to Caulfield a proposed new agreement. The proposal, a copy of which is appended to Caulfield’s affidavit, is headed “Draft of Agreement for Advisory Services to sell marketing/Distribution Rights.” It recites that “Novelos proposes to compensate Kenmare for helping Novelos sell Marketing/Distribution rights ... to pharmaceutical companies,” at specified commission rates depending on the relative roles of Kenmare and Novelos with respect to any particular purchaser. The draft also indicates that “This Agreement should supersede any previous agreements.” Although this proposal did not culminate in agreement, Caulfield and Harry Palmin did agree, according to Caulfield’s affidavit, “that Kenmare was entitled to some compensation, in the area of $2,000,000, in consideration for the value of Kenmare’s services in redirecting their clinical development and business strategy.”
On November 28, 1999, Kenmare sent Novelos an invoice for its services in the amount of $4,646,675, plus warrants for the purchase of 1,045 shares of Novelos stock. Caulfield’s affidavit asserts that he sent the invoice “[i]n order to expedite negotiations over the amount'due Kenmare.” The invoice, in the form of a letter from Caulfield to Harry Palmin, claimed that *393 Novelos was entitled to payment because “(o]ur advisory services are responsible for the change in the Novelos Business Plan,” and went on to detail the advisory services for which Kenmare claimed credit. The invoice identified the amount charged as consisting of three components: (a) a thirteen percent commission- on $35,350,000 in “Savings for Clinical Trials,” resulting from the change in strategy, (b) a commission of six and one half percent on $795,000 in notes sold by Novelos to investors between August 21, 1998 and November 1, 1999, and (c) a commission on the sale of rights to Newcastle Pharmaceuticals in the amount of thirteen percent of the first $855,000 raised and two percent on any additional funds raised. The invoice also asserted that Kenmare would be entitled to commissions on any future transaction with any pharmaceutical company with which it had “negotiated Confidential Disclosure Agreements." Novelos’s response to Kenmare’s invoice, according to Caulfield’s affidavit, was that “Novelos then considered the Agreement to have terminated because no private placement had occurred by January 15,1999.”
Kenmare believes, according to Caulfield’s affidavit, that after the initiation of this litigation Novelos has “engaged in Alternative Transactions” utilizing the “business strategy Kenmare proposed in the Spring of 1999.” Among these, Kenmare asserts, are a license agreement with Phytera, Inc., in July 2000, and sales of convertible notes in August and October of 2000 to purchasers affiliated with something referred to as the Masthead Entities. Novelos offers evidence, which Kenmare does not contest, that Kenmare never had any contact with either Masthead or Phytera on behalf of Novelos. Kenmare contends that it would elicit evidence of additional such transactions if permitted to conduct further discovery on this topic.
In answer to Novelos’s interrogatory regarding the amount and basis of the compensation “to which Kenmare claims it is entitled,” Kenmare refers to its invoice of November 28, 1999, reiterating the contentions and calculations set forth there. Kenmare’s answer also asserts that it provided certain additional services and advice, not recited in the invoice, and that ”[t]he work was performed continuously from the date of the Advisory Agreement, August 21, 1998 to March 20, 2000 by Kenmare full time” with the exception of ten days when Virginia Rybski was otherwise engaged.
Novelos brought this action on March 10, 2000. Its complaint alleges fraud by both Kenmare and Caulfield (counts I and II), and seeks a declaration that it owes Kenmare no compensation under the contract (count III). After some initial procedural skirmishes, Kenmare and Caulfield answered, with Kenmare asserting a counterclaim for damages on theories of breach of contract (count I), breach of the implied covenant of good faith and fair dealing (count II), quantum meruit (count III), unjust enrichment (count V), and violation of G.L.c. 93A (count IV). Novelos now seeks summary judgment on its declaratory judgment claim and on Kenmare’s counterclaims. It contends that no compensation is due under the contract, on two alternative grounds. First, Novelos contends that the contract was void ab initio, pursuant to G.L.c. 110, §410(f), because it provided for conduct in violation of c. 110A, §201(a). Second, Novelos contends that even if the contract or some part of it were enforceable, Kenmare would be entitled to no compensation under its terms because Kenmare failed to accomplish the only task for which the contract provided for it to be compensated — that is, the raising of capital for Novelos. As to the other counterclaims, Novelos contends that the existence of a contract for commission-based compensation, under which-no commission is due, precludes recovery on any of the theories asserted.
DISCUSSION
This Court grants summary judgment where no genuine issues of material fact exist, and the undisputed facts entitle the moving party to judgment as a matter of law. Hakim v. Massachusetts Insurers’ Insolvency Fund, 424 Mass. 275, 281 (1997); Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Community Nat’l Bank v. Dawes, 369 Mass. 550, 553 (1976); Mass.R.Civ.P. 56(c). The moving party bears the burden of affirmatively demonstrating that there is no genuine dispute of material fact on every relevant issue. Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). A party moving for summary judgment who does not bear the burden of proof at trial may demonstrate the absence of a triable issue either by submitting affirmative evidence negating an essential element of the nonmoving party’s case or by showing that the nonmoving party has no reasonable expectation of proving an essential element of the claim at trial. Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991). Once the moving party establishes the absence of a triable issue, the party opposing the motion must respond and allege specific facts establishing the existence of a genuine issue of material fact. Pederson, 404 Mass. at 17. “To avoid summary judgment, an opposing party may not rely upon his pleadings or bald conclusions but must set forth specific facts showing that there is a genuine issue for trial.” United States Trust Co. of New York v. Herriott, 10 Mass.App.Ct. 313, 318 (1980); see also Trustees of Tufts College v. Parlane Sportswear Co., Inc., 4 Mass.App.Ct. 783, 784 (1976).
1. Application of G.L.c. 110A, §410(f).
Chapter 110A of the General Laws regulates the sale of securities in Massachusetts. Section 201 of c. 110A provides that ”[i]t is unlawful for any person to transact business in the commonwealth as a broker-dealer or agent unless he is registered under this chapter.” Section 401(c) defines “broker-dealer” as “any person engaged in the business of effecting transactions in securities for the account of others or for *394 his own account,” subject to certain exclusions not applicable here.[8] The statute does not define “effecting transactions.” That phrase derives content, however, from §410(a), which imposes civil liability on any person who “offers or sells a security in violation of section 201(a).” “Offer” is defined in §401(i)(2) as including “every attempt or offer to dispose of, or solicitation of an offer to buy, a security or interest in a security for value.” See generally, Commonwealth v. David, 365 Mass. 47, 50 (1974); Giordano v. Auditore, 355 Mass. 254, 257 (1969) (discussing scope of statute).
The statute provides a variety of consequences for violations, including civil investigations by the Secretary of State, §407(a), administrative cease and desist orders, §407A, injunctions, §408, criminal penalties, §409(a), and civil liability, §410(a). Section §410(f) establishes an additional consequence, as follows:
No person who has made or engaged in the performance of any contract in violation of any provision of this chapter or any rule or order hereunder, or who has acquired any purported right under any such contract with knowledge of the facts by reason of which its making or performance was in violation, may base any suit on the contract.
The undisputed facts, as set out supra, leave no room for doubt that the contract on which Kenmare bases its claim provided for it to solicit investors for the purchase of Novelos stock, and that Kenmare in fact did so, albeit unsuccessfully, pursuant to the contract, for a period of over a year. Further, the undisputed facts establish that Kenmare engaged in that activity as its principal, if not sole, business, during that period.[9] The contract thus provided for Kenmare to act as a broker-dealer, although unregistered, in violation of §201(a). It follows that Kenmare may not “base any suit on the contract.”
Kenmare seeks to avoid this conclusion by minimizing its activities in connection with efforts to sell stock, and emphasizing instead its efforts to effectuate an “alternative transaction,” as defined in paragraph 9 of the agreement. Under its plain terms, however, §410(f) applies to a contract that calls for conduct in violation of the statute, regardless of the actual activities of the parties under that contract. Here, there is no question that the contract called for Kenmare to solicit investors to purchase Novelos stock. Section 410(f) thus renders the contract unenforceable, regardless of the extent to which Kenmare actually did so.
Kenmare’s next argument is that even if §410(f) would bar enforcement of the provisions of the contract relating to placement of stock, it does not bar enforcement of paragraph 14(a), under which Kenmare claims a commission for what it seeks to characterize as “alternative transactions.” In support of this argument, Kenmare relies on Cadillac Auto Co. of Boston v. Engeian, 339 Mass. 26, 30 (1959). The issue presented there was whether a forum selection clause, unenforceable under Massachusetts law as then existing, rendered void the entire contract of guaranty in which it appeared. The Court held that it did not, applying the general rule that “[i]f the part of a contract . . . which is valid, can be separated from that which is void, and carried into effect, it may be done.” Because “the clause in question goes only to the method of settlement of disputes under the contract . . . and does not impair the substantive rights under it,” the Court held the offending provision severable, and enforced the remainder of the contract.
The difference between this case and Cadillac Auto Co. of Boston is obvious. Here, the illegality is not a minor provision relating solely to dispute resolution or some other incidental matter; rather, the essence of the contract is an agreement for Kenmare to do exactly what the statute prohibits. See Green v. Richmond, 369 Mass. 47, 51 (1975) (“there can be no recovery if the performance was in fact illegal, and the illegality was serious and not merely an incidental part of the performance of the agreement”).
More fundamentally, the severability doctrine applied in Cadillac Auto is a rule of contract interpretation, not one of statutory construction. The question here is not what the parties meant in their agreement, but what the legislature meant in enacting §410(f). The answer to that question is apparent in the plain language of the statute, barring any suit “base[d] . . . on the contract.” The legislature did not limit the bar to those portions of a contract that call for conduct in violation of the statute; rather the plain language of §410(f) bars any claim under the entire contract. The purpose of such a broad rule is apparent; the legislature sought to promote compliance with the statute, and to deter its violation, by imposing severe and automatic consequences. Accordingly, Novelos is entitled to judgment as a matter of law on its claim for declaratory judgment, and on counts I and II of Kenmare’s complaint, both of which are explicitly based on the contract. Kenmare’s c. 93A claim must fail as well, since it depends on the allegation that Novelos refused to pay compensation due under the contract.
Kenmare contends that it remains entitled to compensation for its services on theories of quantum meruit and unjust enrichment. Its argument, in substance, is that even if it cannot obtain a commission under the contract on capital raised, Novelos is obligated to pay it for the value of the business advice it provided. To prevail on this theory, Kenmare would have to show that Novelos reasonably should have expected to pay for Kenmare’s business advice, apart from any commissions that Kenmare would have been due under the contract. See J.A. Sullivan Corp. v. Commonwealth, 397 Mass. 789, 795 (1986); Lattuca v. Cusolito, 343 Mass. 747, 752 (1962); Community Builders, Inc. v. Indian Motorcycle Associates, Inc., 44 Mass.App.Ct. 537, 560 (1998). The evidence offered is *395 devoid of anything to indicate that Kenmare could make that showing at trial. To the contrary, the undisputed facts, considered in the light most favorable to Kenmare, indicate that the parties agreed to payment only pursuant to the contract, in the form of commissions on capital raised by means of the sale of stock or the alternative transactions specified in the contract, and that Kenmare provided its services in the context of its effort to perform the contract. Under these circumstances, recovery on the alternate theories proposed would be indistinguishable from enforcement of the contract, which the statute prohibits. Accordingly, Novelos is entitled to judgment as a matter of law on counts III and V of Kenmare’s counterclaim.
CONCLUSION AND ORDER
For the reasons stated, it is hereby ordered that Novelos Therapeutics, Inc.’s Motion for Partial Summary Judgment is ALLOWED.

 After two hearings on the present motions, defendants informed the Court that, prior to either of those hearings, defendant Caulfield, but not Kenmare, had filed a petition for bankruptcy protection, triggering the automatic stay of claims against him under the bankruptcy code. Accordingly, the Court will address the present motions only as to Kenmare, and not as to Caulfield.

 The parties dispute whether Novelos knew, at the time of the contract, that Kenmare was unregistered. Caulfield asserts in his affidavit that he made repeated full disclosure, and that he relied on legal advice from Novelos’s attorney, conveyed to him through Simyon Palmin of Novelos, that “so long as we left the price and quantity terms blank in any offering documents, that those documents would not constitute an Offering for purposes of the Blue Sky Act, and that therefore neither Novelos nor Kenmare would be violating the Act.” Palmin asserts in his affidavit that he believed Kenmare and Caulfield to be “legally authorized to conduct the offering and sale of securities,” and that Novelos relied on that belief.

 This date was apparently intended to be January 15, 1999.

 The cover letters refer to the enclosure as a “prospectus," but the record identifies no document to which this term might refer other than the Private Offering Memorandum.

 This date appears inconsistent with the other information provided, but the record does not clarify.

 Kenmare's use of the word “published” leaves some uncertainty as to whether it made the report public, over the objection of its own client, or merely released it to Novelos and other entities involved with Novelos’s business.

 The record provides little additional explanation of this transaction. The parties’ references to it suggest that it did not actually generate any capital for Novelos, but rather involved an undertaking by Newcastle, apparently unsuccessful, to attempt to raise capital through the resale of rights.

 One of the exclusions is “an agent,” which the §401(b) defines as “any individual other than a broker-dealer who represents abroker-dealer or issuer in effecting or attempting to effect purchases or sales of securities,” subject to certain exclusions. At the second hearing on these motions, after initially attempting to characterize itself as an agent, Kenmare acknowledged that it cannot fall within that definition, since it is not an “individual.”

 Kenmare suggests that it was not “in the business” of effecting such transactions, because “the transaction contemplated by the Agreement was the only such transaction Kenmare has ever been involved in.” As a business corporation, however, Kenmare can hardly avoid the conclusion that it was in the business of the activity that occupied virtually all of its effort.